**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FREEDOM WATCH, INC.
2020 Pennsylvania Ave. NW, Suite 345
Washington, DC 20006

                      Plaintiff,

   v.

KEVIN K. MCALEENAN
Acting Secretary
Dep't of Homeland Security
500 12th Street, SW
Washington, D.C. 20536

                  Defendant.

CIVIL CASE No. _____

**COMPLAINT FOR WRIT OF MANDAMUS TO ORDER U.S. DEPARTMENT OF HOMELAND SECURURITY TO COMMENCE INVESTIGATION OF REP. ILHAN OMAR**

## I.    INTRODUCTION

Freedom Watch, Inc. hereby petitions the U.S. Department of Homeland Security ("DHS") and respectfully demands the Department by its Immigration and Customs Enforcement ("ICE") and U.S. Citizen and Immigration Services ("USCIS") components to conduct an investigation and initiate deportation (removal) proceedings and/or refer for prosecution to the U.S. Department of Justice the immigration fraud of Ilhan Omar, a resident of Minneapolis, Minnesota, has perpetrated.

The Plaintiff respectfully moves the Court for an order for the issuance of a writ of mandamus for the Defendant to enforce governing immigration law, and/or to challenge government inaction pursuant to the Administrative Procedures Act ("APA").  5 U.S.C. §§ 551-559.

## II.   PARTIES

1.   **Plaintiff Freedom Watch, Inc.** is a public interest group that investigates and prosecutes government corruption.  Larry Klayman is an attorney active in the public interest and is the founder of Judicial Watch, Inc. and now Chairman and General Counsel of Freedom Watch, Inc.  See www.freedomwatchusa.org.

2.   **Defendant U.S. Department of Homeland Security** ("DHS"), including its components ICE and USCIS, located in Washington, D.C., is the agency ultimately in charge of enforcing immigration laws of the nation enacted by Congress including by removal (deportation) proceedings of foreign nationals in the country without valid status for presence in the United States.

3.   **DHS' failure to commence an investigation given the compelling and severe well-documented and uncontroverted facts as set forth in Plaintiff's Complaint, Exhibit 1, and which is incorporated herein by reference, is a clear cut abuse of discretion and/or arbitrary and capricious.**

4.   This petition for investigation, denaturalization, removal, deportation, and referral to U.S. Department of Justice ("DOJ") for prosecution addresses Ms. Ilhan Omar, a woman born in Mogadishu, Somalia or in a village within the greater Mogadishu metropolitan area, whose date of birth is October 4, 1981.  Ms. Omar spent her early years in Baydhabo, Somalia, and entered the United States to a Virginia address in Arlington, Virginia, from a Mombasa, Kenya, refugee camp in or about 1993.  She is the daughter of her mother Fadhuma Abukar Haji Hussein and her father Nur Said Elmi Mohamed. She resided in Arlington, Virginia for many years

before she moved to Minnesota, where she continues to reside.

## III.   JURISDICTION AND VENUE

5.      This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§1331 as involving questions and controversies arising under the Constitution and the federal

laws and regulations arising thereunder, specifically the APA. 5 U.S.C. §§ 551-559.

6.      This Court also has jurisdiction under the All Writs Act, 28 U.S.C. § 1651, which

may be invoked by federal courts.  The Act provides:

> The Supreme Court and all courts established by Act of Congress
> may issue all writs necessary and appropriate in aid of their
> respective jurisdictions and agreeable to the usages and principles
> of law.

28 U.S.C. § 1651.  "The authority of federal courts to issue writs of mandamus is derived from

the All Writs Act, 28 U.S.C. § 1651." *United States v. Bell*, 2008 U.S. Dist. LEXIS 91803, 7-8

(E.D. Tenn. Sept. 29, 2008) *citing In re Parker*, 49 F.3d 204, 206 (6th Cir. 1995). Mandamus is

defined as "[a] writ issued by a superior court to compel a lower court or a government officer to

perform mandatory or purely ministerial duties correctly." *Coles v. Granville*, 448 F.3d 853, 861

n. 2 (6th Cir. 2006) (citing Black's Law Dictionary p. 973 (7th ed. 1999). Mandamus is a remedy

which can be invoked in extraordinary situations where the Plaintiff can show a clear and

indisputable right to the relief sought. *Will v. Calvert Fire Ins. Co.*, 437 U.S. 655, 661-62, 98 S.

Ct. 2552, 57 L. Ed. 2d 504 (1978); *Kerr v. United States District Court*, 426 U.S. 394, 402-03,

96 S. Ct. 2119, 48 L. Ed. 2d 725 (1976).

7.      This case is precisely one of those "extraordinary situations" that the court in *Will*

described.

8.      The Plaintiff will have no adequate remedy at law other than to order the agency

to take action upon the matter before it, which DHS is uniquely charged with administering.

9.      Venue is proper in this District because all of the Defendant is headquartered in the District of Columbia.

IV.   **RELIEF SOUGHT**

10.     The Plaintiff now demands that the agency take action on its petition for removal proceedings previously filed with the DHS, but ignored by agency inaction.

11.     In the face of agency inaction, including a lack of any decision or response from the agency, Plaintiff seeks relief under the APA and/or a writ of mandamus compelling agency action by applicable officials of the DHS to enforce the immigration laws enacted by Congress.

12.     On October 2, 2014, Plaintiff filed his petition below with officials of the U.S. Department of Homeland Security to initiate removal proceedings with regard to Congresswoman Ilhan Omar.

13.     The Plaintiff provided precise documentation of the use of fraudulent identity documents by Ilhan Omar and his lack of lawful presence.  The Plaintiff's petition to the agency is attached as Exhibit 1 hereto and its contents incorporated herein by reference.

14.     These matters have never been decided on the merits, but rather evaded and avoided.

15.     The American people are entitled to a clear decision and the confidence that the law is being respected and upheld.

V.    **STATEMENT OF FACTS PERTINENT TO THE PETITION**

16.     Ms. Omar has committed marriage fraud under 8 U.S.C. § 1325 and 18 U.S.C. § 1546(a). The Immigration Marriage Fraud Amendments Act of 1986 provides a penalty of five years imprisonment and a $250,000 fine for any "individual who knowingly enters into a marriage for the purpose of evading any provision of the immigration laws."

17.     There is therefore a strong prima facie presumption that Ms. Omar was not eligible for nationalization. Ms. Omar's own citizenship status may have been invalid due to these circumstances or related events. The circumstances of Ms. Omar acquiring U.S. citizenship remain murky in public reports. Because the basis of Ms. Omar's citizenship is unclear, the role of these events in her own naturalization as a citizen is unclear. However, the details disclosed warrant investigation and review.

18.     Ms. Omar was not eligible for naturalization, including because she was already living safely in the resort city of Mombasa, Kenya, famous for its magnificent beaches on the Indian Ocean, and a magnet for wealthy tourists from Europe and around the world.

19.     Kenya itself, though not "utopia," is a relatively prosperous country due to its tourism economy, with a building boom in Nairobi funded largely by Chinese investors.

20.     Kenya has a relatively stable political system, even though Kenya's democracy is limited and elections not always ideal. It is a relatively secure and safe nation, driven by the government's desire to attract tourism.

21.     Because Omar's family was living safely in Mombasa, Kenya, she was not eligible to be admitted into the United States as a refugee. She was safe in a country near to her home country and not eligible for entry into the United States on the other side of the planet.

22.     She may have also been admitted under "Temporary Protected Status" ("TPS") which would not lead to citizenship.

23.     Therefore, Ms. Omar was not eligible for naturalization as a U.S. citizen because she was not legally and properly eligible to be a refugee. Based on those circumstances, it appears certain that Ms. Omar's application for refugee status -- being already safe in Kenya at the time -- contained false statements making her refugee status fraudulent.

24.     It is clear that false statements or false information provided in support of Ilhan Omar's refugee application -- even by her parents -- would invalidate not only her application for refugee status but also her naturalization as a citizen.

25.     In order to claim refugee status in the United States when already residing in a safe country, it is nearly certain that Omar's refugee application contains false statements and/or false information about facing fear or persecution when already living in safety in a beach resort community that attracts tourists from around the European and Asian regions.

26.     If Ilhan Omar were convicted of marriage fraud, the criminal conviction may be grounds for denaturalization and the loss of citizenship of not only her brother, Ahmed Nur Said Elmi but also Ilhan Omar herself.

27.     If Ilhan Omar joined organizations that provide support to terrorism that makes her ineligible for refugee status, within five years after naturalization.

28.     As a result of joining an organization that supports terrorism, even after obtaining citizenship within 5 years thereof, her citizenship could be revoked.

29.     Support for international terrorism has been one of the clearest and most frequent reason in recent years for the revocation of citizenship (denaturalization).

30.     Even if the proceeding is brought longer than five years after citizenship, if membership in a group such as a terrorist group began less than five years after naturalization, her citizenship can be revoked.

31.     The recently-elected Attorney General of Minnesota, Keith Ellison, has failed to investigate or act upon these facts, because he was elected with Democrat party support in spite of credible evidence of committing sexual assault and his positioning as a Muslim Democrat.

32.     In 2015 and 2016, Omar interceded for a group of six Somalis from Minneapolis

caught at the Mexican border on their way to fight for ISIS in Iraq and Syria.

> As the case went to trial the following year, the then-state representative wrote a letter to the trial judge requesting "compassion" - and lighter sentencing on behalf of one of the Minnesota men, who was facing 30 years jail time.

Hollie McKay, " How Minneapolis' Somali community became the terrorist recruitment capital of the US,"  Fox News, February 16, 2019, accessible at: https://www.foxnews.com/us/how-rep-ilhan-omars-minnesota-district-became-the-terroristrecruitment-capital-of-the-us-officials-highly-concerned

> More men and boys from a Somali American community in Minneapolis have joined – or attempted to join – a foreign terrorist organization over the last 12 years than any other jurisdiction in the country. FBI stats show 45 Somalis left to join the ranks of either the Somalia-based Islamic insurgency al-Shabab, or the Iraq- and Syria based ISIS combined. And as of 2018, a dozen more had been arrested with the intention of leaving to support ISIS. Both numbers are far higher than those of alleged terrorist wannabes who left or attempted to leave the country from other areas in the country where Muslim refugees have been resettled. In the case of the Somalis, it's no longer just the men. Early last year, a female was apprehended by authorities on charges of supporting providing material support to Al Qaeda and arson. *Id.*

> "With by far the largest Somali American population in the United States - estimates of up to 100,000 - the insular ethnic community in Minnesota offers a rich recruiting ground. Investigators told Fox News that early on, al-Shabab recruiting was almost exclusively word-of-mouth. One family connection to a contact in the terrorist group would be pulled in as a recruit,  in a process that was repeated as the ranks of the al-Shabab grew" *Id.*

33.    Ms. Ilhan Omar has recently become known as an overt anti-Semite elected to Congress last November.

34.    She is a supporter of the illegal Boycott, Divestment, and Sanction movement which -- in violation of the Anti-Boycott Act [1] -- seeks to strangle Israel economically.

---

[1]    See: "Israel-Harming BDS Campaign Breaks Federal Law," World Net Daily, January 18, 2019, and the citations compiled therein, accessible at: https://www.wnd.com/2019/01/israel-harming-bds-campaign-breaks-federal-law/

35.     She announced on Twitter:

> **Ilhan Omar Verified account**
> @IlhanMN
> Israel has hypnotized the world, may Allah awaken the
> people and help them see the evil doings of Israel. **#Gaza**
> **#Palestine #Israel**
> 9:15 AM - 16 Nov 2012

36.     Omar faced massive backlash after she stated on February 10, 2019 that Americans' support for Israel is bought by campaign donations from the American Israel Public Affairs Committee (AIPAC) rather than a sincere and genuine alliance of shared values, goals, and interests between Israel and the United States of America which benefits the United States and a keen historical understanding that Israel's enemies are the United States' sworn and mortal enemies, regularly chanting "Death to America!" in organized national demonstrations.

37.     Omar knowingly supports, endorses, and encourages violent enemies of the United States who are sworn, bound by oath and religious mandate, and determined to kill as many U.S. citizens as possible and to do as much harm to the United States as possible.

38.     This overt support for our country's enemies cannot be dismissed as naiveté.  As Winston Churchill reportedly warned Neville Chamberlain "You might not be interested in war. But war might be interested in you."

39.     The laws on the books are there to defend the United States against its enemies.

40.     Even as late as yesterday, Hamas TV in the Palestinian territories was still airing incitement to war against Israel, telling Palestinians to "scatter the enemies' body parts, make the skulls fly in the sky."

> Hamas' Al Aqsa TV, which Israel officially deemed a terrorist organization
> earlier this month, aired a music video calling for the resumption of suicide
> bombings and for Palestinians to "stab, bomb, and make eyes weep,"
> according to a translation by Palestinian Media Watch, which first reported

on the video.  "Wrap the explosive belt around you. … Oh brave one," the song lyrics read. "Blow up the Zionists."

Deborah Danan, <u>Breitbart</u>, March 29, 2019, accessible at:  https://www.breitbart.com/middle-east/2019/03/29/hamas-tv-scatter-israeli-body-parts-make-skulls-fly/

41.     Yet Ilhan Omar has eagerly chosen to become a lobbyist on behalf of the United States' enemies without registering under the Foreign Agents Registration Act (FARA).

42.     The hateful anti-Semitic comments received swift condemnation from congressional members on both sides of the aisle, including the Democratic leadership and the White House. See:  https://dailycaller.com/2019/02/11/jerry-nadler-ilhan-omar-jews/

43.     Invoking anti-Semitic themes of rich Jews corrupting and manipulating leaders and others with their vast money, and suggesting that support of Israel is only a result of campaign donations from AIPAC (which does not donate to candidates), Ms. Omar publicly explained:

**"It's all about the Benjamins baby "**

44.     Omar was the keynote speaker at the Council for American Islamic Relations' ("CAIR") 4th Annual Valley Banquet on March 23, 2019 at Woodland Hills, California, where she dismissed the tragedy of September 11, 2019 as just some persons "doing something."

45.     The U.S. Department of Justice had previously named CAIR as an unindicted co-conspirator in a criminal prosecution of the Holy Land Foundation in Dallas, Texas for allegedly funneling millions of dollars to the terrorist organization Hamas.

46.     Additionally, the United Arab Emirates (UAE) named CAIR a terrorist organization along with al-Qaeda and ISIS in 2014.

47.     Omar was also the keynote speaker this month at a fundraising event for Islamic Relief USA ("IRUSA"), an affiliate of Islamic Relief Worldwide ("IRW"), the largest

international Islamic charity in the world.

48.     The connections between the IRUSA, the IRW and terrorism indicate Ilhan

Omar's support for and/or membership in organizations that provide support to terrorists.

49.     In 1999, the IRW accepted a $50,000 check from Osama Bin Laden.

50.     In 2006, Israel arrested its project coordinator in its Gaza office for funneling

money to Hamas.

51.     In June 2014, Israel officially declared the organization to be illegal and banned it

from operating in Israel and the Palestinian territories.

52.     In November 2014, the United Arab Emirates declared the IRW to be a terrorist

group.

53.     Omar spoke alongside senior IRUSA official Yousef Abdallah, who was widely

criticized in 2017 after the Middle East Forum found he had expressed violently anti-Semitic

ideas on his social media accounts.

54.     Ms. Omar recorded a video talk show interview joking about the "terrorism

course" that she took in college, implying that terrorism experts remain unaware of what Al

Qaeda is and is up to, and Ms. Omar has better knowledge of Al Qaeda's threat to the United

States. The news interview video was posted by The Washington Pundit on February 15 2019 at

https://www.facebook.com/thewashingtonpundit/videos/vb.901809423308055/25749963183161

0/?type=2&theater

55.     Ms. Ilhan Omar relocated from Arlington, Virginia to Minnesota — in a State and

region within Minnesota with a high Somali immigrant population — where she has resided

since.

56.     The Somali immigrant population in Minnesota has exploded to the point where

her neighborhood is known as Little Mogadishu.

57.     Thereupon, in 2002, according to marriage records in Minnesota's Hennepin County, Omar applied for a license to marry her current husband, Ahmed Abdisalan Hirsi, who Omar says went by Ahmed Abdisalan Aden at the time in 2002.

58.     Mr. Hirsi is the father of Omar's three children. Omar is depicted with Hirsi and their children on her social media and internet postings. See: https://www.apnews.com/cc2ccd70de56405098d2f259bf0e46c5

59.     Thereupon, on February 12, 2009, Ms. Ilhan Omar married her brother, Ahmed Nur Said Elmi, who was not a US citizen, according to a marriage certificate issued in Hennepin County.

60.     It appears that Ms. Omar was still married at the time to Mr. Ahmed Hirsi. Omar disputes that Elmi is her brother, but there appears to be no other conclusion possible. Elmi's birthdate on the couple's marriage certificate would make him three years younger than her. Omar's campaign has said she and others can't get birth certificates because the infrastructure in Somalia collapsed during a civil war.

61.     Ms. Omar is evasive about her family, describing herself variously as one of seven, six, or five siblings.

62.     In 2011, Ms. Omar separated from Elmi, with a Muslim cultural divorce not an official governmental divorce.

63.     But in 2012, Ms. Omar reunited with Hirsi and had a third child with him, according to her divorce records.

64.     In 2017, Ms. Omar formally divorced Elmi (after being elected to the legislature).

65.     In 2018 Omar either married or re-married Hirsi.

66.    The evidence indicates that Ms. Omar's sham marriage to her brother was an immigration fraud to assist his entry into the United States and intended for him to be naturalized as a U.S. citizen.

67.    Her brother was a British citizen at the time.

68.    As a British citizen, he should have been able to enter the United States easily.

69.    But to obtain U.S. citizenship, his marriage to Ms. Omar would facilitate naturalization.

70.    "As soon as Ilhan Omar married him," journalists report, "he started university at her [a]lma mater North Dakota State University where he graduated in 2012.

71.    Shortly thereafter, he moved to Minneapolis where he was living in a public housing complex and was later evicted. He then returned to the United Kingdom where he now lives."

72.    In August 2016, Omar released a statement saying, "I have yet to legally divorce Ahmed Nur Said Elmi, but am in the process of doing so."

73.    Several months later, Omar filed for divorce from Elmi in May of 2017. Reporters' research indicates that he now resides in London.

74.    Scott Johnson of Powerline Blog points out that Omar's first response to the questions was to hire Jean Brandl, a well-known criminal defense attorney to respond to the Powerline Blog author.

75.    Johnson is the writer who broke the story of Ilhan Omar possibly marrying her own brother back in August 2016.

76.    Investigative journalist Laura Loomer was one of the early, leading investigators uncovering these events, leading to evasive attempts to silence the reports instead of to answer

them with sound information. Jim Hoft, <u>The Gateway Pundit</u>, August 12, 2018. See: https://www.thegatewaypundit.com/2018/08/video-laura-loomer-confronts-democrat-muslimcandidate-on-why-she-married-her-brother-is-kicked-off-facebook-after-posting-the-video/

77.     The evasive responses raise concerns as a pattern, because it is part of the lifestyle (more than just a claimed religion) from which Ilhan Omar engages in strategic deception called "Taqiyya."  See "Deception, Lying and Taqiyya," at "What Makes Islam so Different," https://www.thereligionofpeace.com/pages/quran/taqiyya.aspx, and "Islam Permits Lying to Deceive          Unbelievers,"          http://www.muslimfact.com/bm/terror-in-the-name-of-islam/islampermits-lying-to-deceive-unbelievers-and-bri.shtml

78.     An investigative reporter at Alpha News discovered and reports that reporter Cory Zurkowski of <u>City Pages</u> seems to have revealed too much in trying to cover up the violations. 'Whether or not Mr. Zurowski realizes it, he has shed new light into the Omar case.

79.     The story, which was originally published on Wednesday, October 26, Mr. Zurowski wrote that Ilhan Omar's father is named 'Nur Said Elmi Mohamed.' A day later, Zurowski's article was changed and now Omar's father's name appears in the article as 'Nur Omar     Mohamed'.  "  This  relates  to  a  report  by  Cory  Zurkowski  at: http://www.citypages.com/news/ilhan-omars-improbable-journeyfrom-refugee-camp-to-minnesota-legislature/398441901

80.     In other words, <u>City Pages</u> altered their story to remove the part of Ms. Omar's family name -- "Elmi" -- which reveals the biological family relationship between Ms. Omar and her brother Ahmed Nur Said Elmi. Not only does this raise questions of journalistic ethics, but it underscores that Ms. Omar and her supporters recognize that Mr. Elmi is Ms. Omar's brother,

and so they leaped to remove the "Elmi" from the news reporting.

81.     Much reporting on this topic focuses on the different name conventions used among Somalis to identify where a common family name appears in the presentation of a name.

82.     Research reported by <u>Alpha News</u> suggests that Omar was involved with Ahmed Nur Said Elmi (her legal husband) and Ahmed Hirsi (her cultural husband and father of her children) at the same time.

83.     Ms. Omar's marriage to her brother would be illegal under Minnesota law. It would be void *ab initio*, as though it never occurred. Any such second marriage might be bigamous as well as fraudulent.

84.     Minnesota law defines bigamy as "knowingly having a prior marriage that is not dissolved" while also "contract[ing] a marriage in this state." Bigamy is a crime punishable by up to five years in prison or a fine up to $10,000.  The definition and penalty provisions of the crime of bigamy are set forth in Minn. Stat. § 609.355.

85.     Christine Baumann reporting for <u>Alpha News</u>, October 24, 2018, confirmed both marriages      in      online      Minnesota      Official      Marriage      System.      See: https://alphanewsmn.com/newevidence-supports-claims-that-ilhan-omar-married-her-brother/

86.     Christine Baumann reports the following analysis, that according to official student enrollment records archived by St. Paul Public Schools and the state of Minnesota, an "Ahmed N. Elmi" was enrolled as a senior in the Class of 2003 at Arlington Senior High School in St. Paul, Minnesota, from September 6, 2002, until June 10, 2003.  He graduated and received a diploma.

87.     The enrollment record states that "Ahmed N. Elmi" was born on April 4, 1985. Ms. Baumann further reports that both Ilhan Omar's 2009 marriage documents and her 2017

divorce proceedings state that Ahmed Nur Said Elmi was born on April 4, 1985.

88.     And Baumman reports that "After an extensive background search, I have not been able to find any other person named "Ahmed Nur Said Elmi," "Ahmed N. Elmi," or even "Ahmed Elmi" with the birthdate April 4, 1985. The man Ilhan Omar married and the 17- to 18-year-old who attended Arlington Senior High School in St. Paul, MN, in 2002-2003 are one and the same."

89.     Baumann also reports that Ms. Omar claims that she and Elmi terminated their relationship so she could resume her relationship with Hirsi. She also claims in court documents that she hasn't spoken or seen her estranged husband since June 2011. However, Alpha News obtained documentation via social media that shows these statements to be false.

90.     That is, instead of one marriage ending being replaced by another, social media shows that Ms. Omar continued a social relationship with both men simultaneously, consistent with a sham marriage with her brother and a real marriage to Mr. Hirsi unfolding at the same time.

91.     According to social media posts as reported by Baumann, the timeline of contact between Omar and Elmi extended multiple years beyond 2011.

92.     Screenshots from social media indicate Elmi lived in Minneapolis until August 2012, when he moved back to London.

93.     Alpha News also reported that Elmi and Omar attended NDSU at the same time. Baumann reports Instagram posts showing Omar and Elmi communicating via social media until October 2013.

94.     Adding to the belief that Elmi is indeed Omar's brother, the social media posts include comments in which Elmi refers to Omar's two girls as his nieces, and Omar says he is

the "best uncle."

95.     Omar also made a trip to London in 2014, where Elmi was then residing. Photos

from Instagram that have since been deleted showed Omar and Elmi together.

VI.     **GOVERNING LAW**

     **A.  AUTHORITY TO ORDER AGENCY TO TAKE ACTION
        UPON PETITION**

96.     **8 C.F.R. § 270.2 Enforcement procedures** provides specifically with regard to

the use of false documents that:

> **(a)** *Procedures for the filing of complaints.* Any person or entity
> having knowledge of a violation or potential violation of section
> 274C of the Act may submit a signed, written complaint to the
> Service office having jurisdiction over the business or residence of
> the potential violator or the location where the violation occurred.
> The signed, written complaint must contain sufficient information
> to identify both the complainant and the alleged violator, including
> their names and addresses. The complaint should also contain
> detailed factual allegations relating to the potential violation
> including the date, time and place of the alleged violation and the
> specific act or conduct alleged to constitute a violation of the Act.
> Written complaints may be delivered either by mail to the
> appropriate Service office or by personally appearing before any
> immigration officer at a Service office.

> **(b)** *Investigation.* When the Service receives complaints from a
> third party in accordance with paragraph (a) of this section, it shall
> investigate only those complaints which, on their face, have a
> substantial probability of validity. The Service may also conduct
> investigations for violations on its own initiative, and without
> having received a written complaint. If it is determined after
> investigation that the person or entity has violated section 274C of
> the Act, the Service may issue and serve upon the alleged violator
> a Notice of Intent to Fine.

> **(c)** *Issuance of a subpoena.* Service officers shall have reasonable
> access to examine any relevant evidence of any person or entity
> being investigated. The Service may issue subpoenas pursuant to
> its authority under sections 235(a) and 287 of the Act, in
> accordance with the procedures set forth in § 287.4 of this chapter.
>        \* \* \*

97.    In the face of agency inaction, this Court may order an agency to fulfill its

statutory responsibilities:

> Second, agency inaction may represent "agency recalcitrance ... in the face of a clear statutory duty ... of such magnitude that it amounts to an abdication of statutory responsibility." Examples of such clear duties to act include provisions that require an agency to take specific action when certain preconditions have been met. When an agency violates such a duty through inaction, "the court has the power to order the agency to act to carry out its substantive statutory mandates."

> This court may have jurisdiction to review claims alleging inaction in this type of case for either or both of two reasons. If the withheld agency action would be reviewable under the APA, then this type of inaction represents action that has been "unlawfully withheld"; the agency might forever evade our review and thus escape its duties if we awaited final action before reviewing this claim. ***Even as to those actions not covered by the APA, it is apparent that, if an agency is under an unequivocal statutory duty to act, failure so to act constitutes, in effect, an affirmative act that triggers "final agency action" review.***

> In either case, pursuant to a "final agency action" review provision and our decision in TRAC, this court would normally exercise jurisdiction over such a claim.

*Sierra Club v. Thomas*, 828 F.2d 783, 793, 264 U.S.App.D.C. 203 (C.A.D.C., 1987) (footnote citations omitted) (emphasis added).

98.    This Court has the authority to review a failure of an agency to act in its statutory

responsibilities:

> First, agency inaction may represent effectively final agency action that the agency has not frankly acknowledged: "when administrative inaction has precisely the same impact on the rights of the parties as denial of relief, an agency cannot preclude judicial review by casting its decision in the form of inaction rather than in the form of an order denying relief." In such a situation, "the court can undertake review as though the agency had denied the requested relief and can order an agency to either act or provide a reasoned explanation for its failure to act." *Id.* (footnote citations omitted).

99.  Alternatively, relief is available from writ of mandamus if (1) the plaintiff has a clear right to relief;  (2) the defendant has a clear duty to act;  and (3) there is no other adequate remedy available to the plaintiff.   See, e.g., *Jones v. Alexander*, 609 F.2d 778, 781 (5th Cir.), cert. denied,  449 U.S. 832,  101 S.Ct. 100,  66 L.Ed.2d 37 (1980);  *Allied Chemical Corp. v. Daiflon, Inc.*, 449 U.S. 33,  101 S.Ct. 188,  66 L.Ed.2d 193 (1980).

100.  Here, the Plaintiff has a clear right to a decision one way or the other from DHS and DHS has a clear duty to review the evidence upon a complaint and render a decision.  There is no other remedy available under the law.

**B.  Requirement for Defendant to Implement Non-Optional
Provisions of the Immigration and Naturalization Act**

101.  Defendant DHS is charged with enforcing the laws enacted by Congress, including the Immigration and Naturalization Act ("INA") of 1952, as amended over time.

102.  Congress exclusively committed the INA to DHS for implementation.

103.  The Defendant must enforce the INA, including to initiate removal proceedings when facts indicate that a person in the country might not have legal status, by investigating and determining the person's correct immigration status under the INA.

104.  Article I, Section 8 of the U.S. Constitution vests only in the Congress the exclusive authority over immigration and the admission and removal of foreigners.

105.  Article VI of the Constitution designates as the "supreme law of the land" laws enacted by Congress – although not policies or actions of the executive branch.

106.  8 U.S.C. § 1229a(a)(3), enacted by Congress, provides (emphasis added):

> **Exclusive procedures:** Unless otherwise specified in this chapter, a proceeding under this section *shall be the sole and exclusive procedure for determining whether an alien may be admitted to the United States or, if the alien has been so admitted, removed from*

*the United States.*

107.    Although the Fourteenth Amendment conveys citizenship, it also provides:

> **5. The Congress shall have power to enforce, by appropriate legislation, the provisions of this article.**

108.    As a result, Congress (but not the executive branch) is expressly empowered to create rules defining citizenship, rules for citizenship, and implementation of citizenship rights.

109.    Thus, the Defendant is legally required to enforce the INA enacted by Congress, by initiating and investigation upon receiving a complaint supported by sworn affidavits.

### C.  <u>Rules of Decision and Procedures for Removal Proceedings</u>

110.    According to **8 U.S. Code § 1229A(a)(1)** "An immigration judge shall conduct proceedings for deciding the inadmissibility or deportability of an alien."

111.    And **8 U.S. Code § 1229A(a)(2)** "**Charges**" provides:

> "An alien placed in proceedings under this section may be charged with any applicable ground of inadmissibility under section 1182(a) of this title or any applicable ground of deportability under section 1227(a) of this title.

112.    Concerning document fraud in particular, **8 U.S.C. § 1324C** provides that:

> **(d) Enforcement**
> **(1) Authority in investigations**
> In conducting investigations and hearings under this subsection—
> > **(A)** immigration officers and administrative law judges shall have reasonable access to examine evidence of any person or entity being investigated,
> > **(B)** administrative law judges, may, if necessary, compel by subpoena the attendance of witnesses and the production of evidence at any designated place or hearing, and
> > \* \* \*

113.    According to **8 U.S. Code § 1229A(e)(2)**

> "The term "removable" means—
> **(A)** in the case of an alien not admitted to the United States, that the alien is inadmissible under section 1182 of this title, or

**(B)** in the case of an alien admitted to the United States, that the alien is deportable under section 1227 of this title.

114.    According to **8 U.S. Code § 1229A(c)(1)(A):**

At the conclusion of the proceeding the immigration judge shall decide whether an alien is removable from the United States. The determination of the immigration judge shall be based only on the evidence produced at the hearing.

## VII.    LEGAL GROUNDS REQUIRING INVESTIGATION AND DENATURALIZATION AND DEPORTATION

### A.    First Count:  Fraud or Willful Misrepresentation of Refugee Status

115.    A person is subject to deportation (removal) for obtaining immigration status or entry into the United States, or by obtaining a U.S. passport under false pretenses, by fraud or willful misrepresentation.

116.    Ilhan Omar entered the United States from Somalia by way of Kenya, applied for an obtained a U.S. passport, registered to vote and voted, and sought and obtained other benefits under the INA on the basis of fraud and willful misrepresentation.

117.    To find a person inadmissible for fraud or willful misrepresentation under INA 212(a)(6)(C)(i), silence or omission can lead to a finding of fraud or willful misrepresentation if it is clear from the evidence that the person consciously concealed information.

118.    If the evidence shows that a person was reasonably aware of the nature of the information sought and knowingly, intentionally, and deliberately concealed information from the officer, then the officer should find that the applicant consciously concealed and willfully misrepresented a material fact.

### B.    Second Count:  Immigration Marriage Fraud

119.    As detailed above, on information and belief, Ilhan Omar is guilty of immigration marriage fraud by marrying her brother -- while still married to her husband -- for the purpose of

using a sham marriage to deceive and defraud the DHS and the United States.

120.     Pursuant to Federal law of the United States of America, the following requirements apply:

121.     Section 1948 of the U.S. Department of Justice Criminal Resource Manual addresses "Marriage Fraud" under 8 U.S.C. 1325(C) and 18 U.S.C. 1546 See: https://www.justice.gov/jm/criminal-resource-manual-1948-marriage-fraud-8-usc-1325c-and-18-usc-1546

> Marriage fraud has been prosecuted, inter alia, under 8 U.S.C. § 1325 and 18 U.S.C. § 1546(a). The Immigration Marriage Fraud Amendments Act of 1986 amended § 1325 by adding § 1325(c), which provides a penalty of five years imprisonment and a $250,000 fine for any "individual who knowingly enters into a marriage for the purpose of evading any provision of the immigration laws."
>
>            * * *
>
> The Supreme Court has ruled that the validity of their marriage under state law is immaterial to the issue of whether they defrauded INS. See *Lutwak v. United States*, 344 U.S. 604 (1953). Lutwak was followed in United States v. Yum, 776 F.2d 490 (4th Cir. 1985); *Johl v. United States*, 370 F.2d 174 (9th Cir.1966), and *Chin Bick Wah v. United States*, 245 F.2d 274 (9th Cir.), cert. denied, 355 U.S. 870 (1957). But see, *United States v. Lozano*, 511 F.2d 1 (7th Cir.), *cert. denied*, 423 U.S. 850 (1975); *United States v. Diogo*, 320 F.2d 898 (2d Cir. 1963). But *cf, United States v. Sarantos*, 455 F.2d 877 (2d Cir. 1972).
>
> There is a line of cases holding that the viability of the marriage, if initially valid, is not a proper concern of the INS. *United States v. Qaisi*, 779 F.2d 346 (6th Cir. 1985); *Dabaghian v. Civilleti*, 607 F.2d 868 (9th Cir. 1979), and cases cited therein. However, the Immigration Marriage Fraud Amendments of 1986, 8 U.S.C. § 1186a, were designed, inter alia, to eliminate the Qaisi type loophole by establishing a two-year conditional status for alien spouses seeking permanent resident status, and requiring that an actual family unit still remain in existence at the end of the two year period.

**C.**     **Third Count:   Membership or Support for Organization Providing Material Support to Terrorism**

122.     Although there appears to be no public information about exactly when Ms. Ilhan

Omar was naturalized, and exactly when her involvement in organizations designated as terrorist

organizations internationally began is not clear.

123.     Nevertheless, on information and belief, it appears clear that Ilhan Omar is

eligible for denaturalization and the revocation of her citizenship:

124.     Pursuant to **8 U.S.C. § 1451 "Revocation of Naturalization"**

(c) Membership in certain organizations; prima facie evidence

If a person who shall have been naturalized after December 24, 1952
shall within five years next following such naturalization become a
member of or affiliated with any organization, membership in or
affiliation with which at the time of naturalization would have precluded
such person from naturalization under the provisions of section 1424 of
this title, it shall be considered prima facie evidence that such person was
not attached to the principles of the Constitution of the United States and
was not well disposed to the good order and happiness of the United
States at the time of naturalization, and, in the absence of countervailing
evidence, it shall be sufficient in the proper proceeding to authorize the
revocation and setting aside of the order admitting such person to
citizenship and the cancellation of the certificate of naturalization as
having been obtained by concealment of a material fact or by willful
misrepresentation, and such revocation and setting aside of the order
admitting such person to citizenship and such canceling of certificate of
naturalization shall be effective as of the original date of the order and
certificate, respectively.

125.     Note that the wording of this statute is activated by membership within five (5)

years of naturalization -- *not when the denaturalization action is initiated.*

126.     If membership in an organization that would make Ilhan Omar ineligible for

naturalization / citizenship at the time of her naturalization application later occurred after the

fact within five years of naturalization, then revocation of naturalization appears to be timely

when initiated later than five years from naturalization.

127.     Therefore, based on the available information, including Ilhan Omar's overt and public support for terrorism and organizations that directly support terrorism, Ilhan Omar's naturalization can be and should be revoked.

### D.   Fourth Count:  Denaturalization for Immigration Fraud

128.     Any person accused of violating immigration laws including document fraud, falsely claiming to be a U.S. citizen, or fraud or misrepresentation to obtain entry into the United States or a desired immigration status may be placed in removal proceedings. U.S. citizens are generally protected from deportation, although if a naturalized U.S. citizen is found guilty of establishing citizenship through fraudulent means, he or she can be deported. A person with one parent who is a U.S. citizen but born outside of the United States must apply for naturalization relying upon identity documents and evidence.

129.     Pursuant to **8 U.S.C. § 1451 "Revocation of Naturalization"**

(a) Concealment of material evidence; refusal to testify

It shall be the duty of the United States attorneys for the respective districts, upon affidavit showing good cause therefor, to institute proceedings in any district court of the United States in the judicial district in which the naturalized citizen may reside at the time of bringing suit, for the purpose of revoking and setting aside the order admitting such person to citizenship and canceling the certificate of naturalization on the ground that such order and certificate of naturalization were illegally procured or were procured by concealment of a material fact or by willful misrepresentation, and such revocation and setting aside of the order admitting such person to citizenship and such canceling of certificate of naturalization shall be effective as of the original date of the order and certificate, respectively: Provided, That refusal on the part of a naturalized citizen within a period of ten years following his naturalization to testify as a witness in any proceeding before a congressional committee concerning his subversive activities, in a case where such person has been convicted of contempt for such refusal, shall be held to constitute a ground for revocation of such person's naturalization under this subsection as having been procured by concealment of a material fact or by willful misrepresentation. If the naturalized citizen does not reside in any judicial district in the United States at the time of bringing such suit, the proceedings may be instituted in

the United States District Court for the District of Columbia or in the United
States district court in the judicial district in which such person last had his
residence.

130.    The predecessor organizations to DHS have deported those who fought against
the United States and its Allies in World War 2 when such membership was belatedly
discovered, even though those organizations no long pose any threat to the United States.

131.    Today, the organizations that Ilhan Omar supports and/or belongs to are among
those chanting "Death to America!" and vowing murder of U.S. citizens right in the present
and/or mass-terrorism attacks against the United States and/or its citizens, now, currently.

**E.  Fifth Count:  Document Fraud**

132.    As detailed above, on information and belief, Ilhan Omar entered the United
States and applied for citizenship although not eligible for either status and may have committed
fraud in the application for refugee status and for naturalization related to her marriage status to
her brother or his.

133.    Pursuant to **8 U.S.C. § 1324C "Penalties for Document Fraud"**

**(a) Activities prohibited**
It is unlawful for any person or entity knowingly—
**(1)** to forge, counterfeit, alter, or falsely make any document for the purpose of
satisfying a requirement of this chapter or to obtain a benefit under this chapter,
**(2)** to use, attempt to use, possess, obtain, accept, or receive or to provide any
forged, counterfeit, altered, or falsely made document in order to satisfy any
requirement of this chapter or to obtain a benefit under this chapter,
**(3)** to use or attempt to use or to provide or attempt to provide any document
lawfully issued to or with respect to a person other than the possessor (including a
deceased individual) for the purpose of satisfying a requirement of this chapter or
obtaining a benefit under this chapter,
**(4)** to accept or receive or to provide any document lawfully issued to or with
respect to a person other than the possessor (including a deceased individual) for
the purpose of complying with section 1324a (b) of this title or obtaining a benefit
under this chapter, or
**(5)** to prepare, file, or assist another in preparing or filing, any application for
benefits under this chapter, or any document required under this chapter, or any
document submitted in connection with such application or document, with

knowledge or in reckless disregard of the fact that such application or document was falsely made or, in whole or in part, does not relate to the person on whose behalf it was or is being submitted, or

\* \* \*

134.   A person is subject to deportation (removal) pursuant to **8 U.S.C. § 1227**

**(a)(3)(C)**

**Document fraud --**
**(i)** In general an alien who is the subject of a final order for violation of section 1324c of this title is deportable.

135.   Concerning document fraud, **8 C.F.R. § 270.2** Enforcement procedures.

**(a) *Procedures for the filing of complaints.*** Any person or entity having knowledge of a violation or potential violation of section 274C of the Act may submit a signed, written complaint to the Service office having jurisdiction over the business or residence of the potential violator or the location where the violation occurred. The signed, written complaint must contain sufficient information to identify both the complainant and the alleged violator, including their names and addresses. The complaint should also contain detailed factual allegations relating to the potential violation including the date, time and place of the alleged violation and the specific act or conduct alleged to constitute a violation of the Act. Written complaints may be delivered either by mail to the appropriate Service office or by personally appearing before any immigration officer at a Service office.

**(b) *Investigation.*** When the Service receives complaints from a third party in accordance with paragraph (a) of this section, it shall investigate only those complaints which, on their face, have a substantial probability of validity. The Service may also conduct investigations for violations on its own initiative, and without having received a written complaint. If it is determined after investigation that the person or entity has violated section 274C of the Act, the Service may issue and serve upon the alleged violator a Notice of Intent to Fine.

**(c) *Issuance of a subpoena.*** Service officers shall have reasonable access to examine any relevant evidence of any person or entity being investigated. The Service may issue subpoenas pursuant to its authority under sections 235(a) and 287 of the Act, in accordance with the procedures set forth in § 287.4 of this chapter.

\* \* \*

## VIII.   CONCLUSION AND PRAYER FOR ISSUANCE OF WRIT OF

**MANDAMUS TO COMPEL AGENCY ACTION.**

In sum, as the facts set forth in this petition mandate, given that Defendant has failed to respond in any way to these allegations, as set forth in detail herein and in Exhibit 1, a writ of mandamus should issue and Defendant should be ordered to be immediately commence a thorough and bona fide investigation and hold an evidentiary hearing, and if necessary institute and deportation proceedings and a criminal referral to DOJ.

The immigration laws of the United States of America are intended in part to ensure that those who become part of the country and particularly those who lead it bear allegiance and loyalty to the United States of America rather than to a foreign country or to interests of other countries generally. This is consistent with the constitutional design and intention for immigration laws and regulations to regulate those joining the citizenry of the country with the goal of loyalty and allegiance to the country, among other factors.

The evidence warrants investigation, hearing, and if necessary deportation and a criminal referral to DOJ concerning Ilhan Omar.  There have been no official governmental investigations into these allegations.

Under the governing law, specifically those set forth in this petition at Exhibit 1, the Defendant must be ordered to commence a thorough and bona fide investigation and convene an evidentiary hearing. Based on the serious and important questions and issues set forth herein, Plaintiff specifically requests that the Department of Homeland Security be ordered to:

**A.** Receive and permit the Plaintiff to appear and present evidence;

**B.** Require the sworn testimony of all involved persons and groups and authorize department investigators to obtain other evidence;

**C.** Obtain all records from USCIS and the U.S. State Department, including

supporting documentation, related to Ilhan Omar and her alleged husband;

**D.** Obtain all records from the State of Minnesota, including supporting documentation related to Ilhan Omar and her alleged husband;

**E.** Thoroughly investigate the highly suspect, evasive, ambiguous, apparently false and non-responsive statements and fraudulent alibis of Ilhan Omar and her alleged husband;

**F.** Take appropriate remedial action, as no one is above the law, including a congresswoman of radical Muslim allegiances from Minnesota even if she will undoubtedly, if the past is a prologue of her actions, attempt to use the "race card" to avoid scrutiny and instead hatefully blame Jews and Christians to try to dissuade the department doing its job and conducting a thorough investigation;

**G.** Investigate whether Ms. Ilhan Omar has committed immigration marriage fraud.

**H.** Investigate whether Ms. Ilhan Omar's citizenship should be revoked based upon having committed the crime of immigration marriage fraud;

**I.** Investigate Ilhan Omar's application for refugee status from Mombasa, Kenya, and evaluate how Ms. Omar qualified for refugee status when already safe in a stable country nearby her original home, and whether Ms. Omar's refugee status and resulting naturalization should be revoked?;

**J.** Investigate Ilhan Omar's participation in anti-Semitic, racist, and/or terrorist or terrorist-supporting organizations as late as within five years of her naturalization;

**K.** Investigate whether Ilhan Omar's citizenship should be revoked due to membership in an organization that is disqualifying for refugee status or citizenship less occurring than 5 years after her naturalization.

**L.**  Investigate and make a criminal referral to DOJ.

In sum, A full investigation should be ordered to be commenced and undertaken, a full evidentiary hearing held, and Ilhan Omar, if the prima facie facts set forth in Freedom Watch's petition at Exhibit 1 are substantiated, Omar should be denaturalized as a citizen of the United States, deported and criminally prosecuted for immigration fraud and her other alleged illegal actions including but not limited to her support if not collaboration  of and with  terrorist related domestic groups like CAIR and the Islamic Society of North America, the Muslim Brotherhood and other international terrorist organizations like Hamas and Hezbollah.

Dated:  May 13, 2019                          Respectfully submitted,


/s/ *Larry Klayman*
Larry Klayman, Esq.
General Counsel
Freedom Watch, Inc.
D.C. Bar No. 334581
2020 Pennsylvania Avenue N.W., Suite 345
Washington, DC 20006
Telephone: (310) 595-0800
Email: leklayman@gmail.com