UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| FREEDOM WATCH, INC., | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 19-cv-1374 (RC) |
| | : | | |
| v. | : | Re Document No.: | 5 |
| | : | | |
| KEVIN K. MCALEENAN, | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING DEFENDANT'S MOTION TO DISMISS

## I. INTRODUCTION

In February 2019, non-profit organization Freedom Watch, Inc. ("Freedom Watch")

petitioned the U.S. Department of Homeland Security ("DHS"), to investigate U.S.

Representative Ilhan Omar for alleged immigration fraud.[1]  After DHS did not respond to this

petition, Freedom Watch filed suit on May 13, 2019, moving this Court to issue a writ of

mandamus compelling two DHS components, U.S. Immigration and Customs Enforcement

("ICE") and U.S. Citizen and Immigration Services ("USCIS") "to enforce governing

immigration law," Compl. 1, by investigating Plaintiff's allegations against Representative

Omar, *see id.* at 26–28.[2]  Defendant moved to dismiss the suit both for lack of subject matter

jurisdiction pursuant to Federal Rule of Civil Procedure 12(b)(1) and for failure to state a claim

---

[1] Plaintiff's complaint states that Freedom Watch filed its DHS petition on October 2, 2014.  Compl. ¶ 12, ECF No. 1.  However, the petition itself, which Plaintiff has attached to its complaint, is dated February 22, 2019.  *See* Petition to Commence Deportation Proceedings for Removal from the United States and/or Prosecution of Ilhan Omar ("Petition"), ECF No. 1-1.  Thus, the Court dates Freedom Watch's submission to DHS to February 22, 2019.

[2] Because the original document is unpaginated, the Court cites to ECF page numbers.

upon which relief can be granted pursuant to Federal Rule of Procedure 12(b)(6). For the forthcoming reasons, the Court grants Defendant's motion to dismiss for lack of standing; in addition, the Court concludes that, even if Plaintiff had standing, Freedom Watch's complaint does not state a claim sufficient to survive Defendant's 12(b)(6) motion to dismiss.

## II. BACKGROUND

### A. Factual and Procedural History

Plaintiff Freedom Watch describes itself as a "public interest group that investigates and prosecutes government corruption." Compl. ¶ 1. The instant suit arises from allegations concerning Representative Omar that Freedom Watch submitted to DHS. Specifically, Freedom Watch filed a petition urging DHS to initiate removal proceedings against Representative Omar, *id.* ¶ 12, based on several overlapping accusations and related factual allegations. First, Freedom Watch alleged in its petition that Representative Omar was not eligible for refugee status and made false statements in seeking admission to the United States. Petition 2–3; *see also* Compl. ¶¶ 17–25. Second, Freedom Watch alleged that Representative Omar committed marriage fraud to assist another individual, asserted to be her brother, in gaining entry to the United States. Petition 5–7; *see also* Compl. ¶¶ 57–95. Finally, Freedom Watch alleged that Representative Omar has engaged in anti-Semitic and terrorist activities, Petition 3–4; *see also* Compl. ¶¶ 27–47, within five years of her naturalization, rendering her subject to deportation, Petition 14; *see also* Compl. 26–28.

After Freedom Watch received no response from DHS, the organization filed suit in this Court. Freedom Watch contends that the agency's inaction not only violates governing immigration laws and regulations that compel agency action, Compl. ¶¶ 96–114 (referencing 8 C.F.R. § 270.2 and several provisions of Immigration and Naturalization Act ("INA")); but also

contravenes the Administrative Procedure Act ("APA"), *id.* at 1 (citing 5 U.S.C. §§ 551–59).

Freedom Watch's complaint includes five "legal grounds requiring investigation and

denaturalization and deportation:" (1) fraud or willful misrepresentation of refugee status, *id.* ¶¶

115–18 (citing 8 U.S.C. § 212(a)(6)(C)(i)); (2) immigration marriage fraud, *id.* ¶¶ 119–21 (citing

8 U.S.C. § 1325(C), 18 U.S.C. § 1546); (3) membership or support for an organization that

provides material support to terrorism, *id.* ¶¶ 122–27, making Representative Omar eligible for

revocation of her citizenship, *id.* ¶¶ 123–24 (citing 8 U.S.C. § 1451); (4) denaturalization for

immigration fraud based upon her alleged misrepresentations, *id.* ¶¶ 128–131 (citing 8 U.S.C. §

1451); and (5) document fraud in association with Representative Omar's marriage, *id.* ¶¶ 132–

34 (citing 8 U.S.C. §§ 1227(a)(3)(C), 8 U.S.C. § 1324(C)).  Because Plaintiff argues that these

alleged violations required DHS to take action and, at a minimum, investigate them, *see* Pl.'s

Opp'n to Def.'s Mot. to Dismiss ("Pl.'s Opp'n") 8, ECF No. 8, and because DHS has not

responded to Freedom Watch's petition, Plaintiff contends that the Court should issue a writ of

mandamus compelling agency action, Compl. 26 ("[T]he evidence warrants investigation,

hearing, and if necessary deportation and a criminal referral to DOJ concerning Ilhan Omar.").

DHS has moved to dismiss Plaintiff's suit for lack of subject matter jurisdiction and for

failure to state a claim pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6),

respectively.  The motion is fully briefed and ripe for the Court's disposition.

### B.  Legal Standard

#### 1.  Federal Rule of Civil Procedure 12(b)(6)

The Federal Rules of Civil Procedure require that a complaint contain "a short and plain

statement of the claim" in order to give the defendant fair notice of the claim and the grounds

upon which it rests.  Fed. R. Civ. P. 8(a)(2); *accord Erickson v. Pardus*, 551 U.S. 89, 93 (2007)

(per curiam).  A motion to dismiss under Rule 12(b)(6) "tests the legal sufficiency of a complaint" under that standard and asks whether the plaintiff has properly stated a claim. *Browning v. Clinton*, 292 F.3d 235, 242 (D.C. Cir. 2002).  A court considering such a motion takes the complaint's factual allegations to be true and construes them liberally in the plaintiff's favor.  *See, e.g.*, *United States v. Philip Morris, Inc.*, 116 F. Supp. 2d 131, 135 (D.D.C. 2000).

Nevertheless, "[t]o survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This means that a plaintiff's factual allegations "must be enough to raise a right to relief above the speculative level, on the assumption that all the allegations in the complaint are true (even if doubtful in fact)."  *Twombly*, 550 U.S. at 555–56 (citations omitted).  "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are thus insufficient to withstand a motion to dismiss.  *Iqbal*, 556 U.S. at 678.  A court need not accept a plaintiff's legal conclusions as true, *see id.*, nor must a court presume the veracity of legal conclusions that are couched as factual allegations.  *See Twombly*, 550 U.S. at 555.

### 2.  Federal Rule of Civil Procedure 12(b)(1)

Federal courts are courts of limited jurisdiction and the law presumes that "a cause lies outside this limited jurisdiction."  *Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994); *see also Gen. Motors Corp. v. EPA*, 363 F.3d 442, 448 (D.C. Cir. 2004).  On a motion to dismiss for lack of subject matter jurisdiction pursuant to Rule 12(b)(1), the plaintiff bears the burden of establishing by a preponderance of the evidence that the court has subject matter jurisdiction.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992); *see also Didban v. Pompeo*, No. 19-CV-881 (CRC), 2020 WL 224517, at *3 (D.D.C. Jan. 15, 2020) (citing *Lujan*,

504 U.S. at 561). A court resolving a Rule 12(b)(1) motion must "accept[] the factual allegations in the complaint as true," *Jerome Stevens Pharm., Inc. v. FDA*, 402 F.3d 1249, 1253–54 (D.C. Cir. 2005), and "must construe the complaint in favor of the complaining party," *Warth v. Seldin*, 422 U.S. 490, 501 (1975).

That said, because subject matter jurisdiction focuses on the court's power to hear the claim, the court must apply the appropriate amount of scrutiny to the plaintiff's factual allegations. As compared to a Rule 12(b)(6) motion for failure to state a claim, a court is to apply closer scrutiny when resolving a Rule 12(b)(1) motion. *See Food & Water Watch, Inc. v. Vilsack*, 808 F.3d 905, 913 (D.C. Cir. 2015) (stating, in context of standing analysis under Rule 12(b)(1) legal standard, that "we do not assume the truth of legal conclusions, nor do we accept inferences that are unsupported by the facts set out in the complaint" (quoting *Arpaio v. Obama*, 797 F.3d 11, 19 (D.C. Cir. 2015)); *see also Macharia v. United States*, 334 F.3d 61, 64, 69 (D.C. Cir. 2003); *Jathoul v. Clinton*, 880 F. Supp. 2d 168, 170 (D.D.C. 2012) ("A court has an 'affirmative obligation to ensure that it is acting within the scope of its jurisdictional authority.' For this reason, 'the [p]laintiff's factual allegations in the complaint . . . will bear closer scrutiny in resolving a 12(b)(1) motion' than in resolving a 12(b)(6) motion for failure to state a claim.'" (quoting *Grand Lodge of Fraternal Order of Police v. Ashcroft*, 185 F. Supp. 2d 9, 13–14 (D.D.C. 2001)); 5A Charles A. Wright & Arthur R. Miller, Federal Practice and Procedure § 1350 (2d ed. 1987). "Where necessary to resolve a jurisdictional challenge under Rule 12(b)(1), 'the court may consider the complaint supplemented by undisputed facts evidenced in the record, or the complaint supplemented by undisputed facts plus the court's resolution of disputed facts.'" *Banneker Ventures, LLC v. Graham*, 798 F.3d 1119, 1129 (D.C. Cir. 2015) (quoting *Herbert v. Nat'l Acad. of Sciences,* 974 F.2d 192, 197 (D.C. Cir. 1992)).

## III. ANALYSIS

Defendants move to dismiss on two grounds: lack of subject matter jurisdiction, *see* Fed. R. Civ. P. 12(b)(1), and failure to state a claim, *see* Fed. R. Civ. P. 12(b)(6). The Court first addresses the jurisdictional question and then considers whether Plaintiff has set forth cognizable mandamus and APA claims. As detailed below, because Plaintiff has neither plausibly established standing nor plausibly made out a claim on which relief can be granted, Freedom Watch's claims cannot survive either one of Defendant's motions to dismiss.

### A. Standing

The Court begins with the jurisdictional question: whether Freedom Watch has standing to pursue its claim. Freedom Watch asserts that it has standing both on the organization's own behalf (organizational standing), Pl.'s Opp'n 6–7, and as a representative of its members (associational standing), Pl.'s Opp'n 4–5.[3] For the forthcoming reasons, Plaintiff has not established injury in fact sufficient to establish standing on either basis.

To establish subject matter jurisdiction, "[t]he plaintiff 'must clearly . . . allege facts demonstrating each element'" of standing. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) (quoting *Warth*, 422 U.S. at 518); *see also Arpaio*, 797 F.3d at 19 ("The plaintiff bears the burden of invoking the court's subject matter jurisdiction, including establishing the elements of standing." (citing *Lujan*, 504 U.S. at 561)). "To establish standing, a plaintiff must show (1) it has suffered a 'concrete and particularized' injury (2) that is 'fairly traceable to the challenged action of the defendant' and (3) that is 'likely' to be 'redressed by a favorable decision,' i.e., a

---

[3] Plaintiff's complaint itself does not mention its members, as Defendant notes. *See* Defendant's Reply in Support of Motion to Dismiss ("Def.'s Reply") 1, ECF No. 10 (noting that Plaintiff "did not plead any facts to support" its "theories of organizational and associational standing" in its complaint). The Court nonetheless may consider material outside the pleading, such as Plaintiff's opposition, to resolve the 12(b)(1) jurisdictional challenge. *See Banneker Ventures, LLC*, 798 F.3d at 1129.

decision granting the plaintiff the relief it seeks." *Elec. Privacy Info. Ctr.* (*EPIC*) *v. Presidential Advisory Comm'n on Election Integrity*, 878 F.3d 371, 376–77 (D.C. Cir. 2017) (quoting *West v. Lynch*, 845 F.3d 1228, 1230 (D.C. Cir. 2017)); *see also Spokeo*, 136 S. Ct. at 1547; *Friends of the Earth, Inc. v. Laidlaw Environmental Servs., Inc.*, 528 U.S. 167, 180–81 (2000). What a plaintiff must assert to satisfy this burden varies depending on the stage of litigation. *See Abigail All. for Better Access to Developmental Drugs v. Eschenbach* (*Abigail All.*), 469 F.3d 129, 132 (D.C. Cir. 2006) (stating that a plaintiff "must establish the predicates for standing 'with the manner and degree of evidence required at' that stage of trial." (quoting *Lujan*, 504 U.S. at 561)); *see also ASPCA v. Feld Entm't, Inc.* (*Feld*), 659 F.3d 13, 19 (D.C. Cir. 2011) (quoting *Lujan*, 504 U.S. at 561). What is required to carry a plaintiff's burden "grows heavier at each stage of the litigation," and at the motion to dismiss stage, "general factual allegations of injury resulting from the defendant's conduct may suffice." *Osborn v. Visa Inc.*, 797 F.3d 1057, 1064 (D.C. Cir. 2015); *see also Abigail All.*, 469 F.3d at 132 (quoting *Lujan*, 504 U.S. at 561).

Additionally, to satisfy Article III's requirements to establish standing, the alleged "injury in fact" must be "(a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Friends of the Earth, Inc.*, 528 U.S. at 180. The asserted injury must be specific to the plaintiff, such that the plaintiff has "a personal stake in the outcome of the controversy." *Warth*, 422 U.S. at 498; *see also Lujan*, 504 U.S. at 560 n.1 (stating that defendant's asserted conduct must affect plaintiff in a "personal and individual way"). Accordingly, it is not enough for a plaintiff to "rais[e] only a generally available grievance about government—claiming only harm to [it] and every citizen's interest in [the] proper application of the Constitution and laws, and seeking relief that no more directly [or] tangibly benefits [the organization] than it does the public at large." *Lance v. Coffman*, 549 U.S. 437, 439 (2007)

(citing *Lujan*, 504 U.S. at 560–61). With these fundamental principles in mind, the Court addresses each of Plaintiff's asserted bases for standing.

### 1. Organizational Standing

Freedom Watch's organizational standing argument turns on a link between DHS's failure to enforce the law and asserted consequences to the organization's mission and finances. Specifically, Freedom Watch contends that "Defendant McAleenan, as head of . . . [DHS,] has directly caused injury" to the organization because "his indifference and inaction towards enforcing the law that DHS is uniquely charged with administering harms Freedom Watch's purpose and mission." Pl.'s Opp'n 4. Plaintiff makes three arguments in support of this claim. First, Freedom Watch asserts that DHS's refusal to investigate has compromised its "mission to inform and educate the public about government corruption and abuse through its normal processes" (Freedom of Information Act ("FOIA") requests and litigation). *Id.* at 7. Second, Freedom Watch states that Defendant's inaction has harmed the organization's finances by "necessarily caus[ing] a corresponding downturn in financial support" and depriving it of "a substantial increase in financial support due to the attendant increase in positive publicity" that the requested investigation would have elicited. *Id.* at 4. In other words, because Freedom Watch is "entirely reliant on support by its members and supporters in the form of contributions and donations," *id.*, Plaintiff argues that the alleged effect of the agency inaction on its bottom line adds up to an organizational harm. Third, Freedom Watch states that Defendant's refusal to act forced it to file a petition with DHS, thereby requiring the organization to "expend resources outside of its normal scope of business." *Id.*

Defendant maintains that none of these arguments support organizational standing. First, DHS characterizes Plaintiff's alleged injury as a generalized grievance—the widely shared

interest of all citizens "in the government following the law"—that is insufficiently concrete and particularized to establish standing.  Def.'s Mot. to Dismiss ("Def.'s Mot.") 7–8, ECF No 5 (citations omitted).  Defendant emphasizes that Freedom Watch has not only failed to specify any particularized allegation that "constitute[s] more than simply a setback to the organization's abstract social interests," *id.* at 8–9, but also failed to identify any non-speculative asserted harm that is "certainly impending," *id.* at 9 (quoting *Clapper v. Amnesty Intern. USA* (*Clapper*), 568 U.S. 398, 409 (2013).  Second, DHS rejects Plaintiff's financial arguments, emphasizing both that Freedom Watch's asserted reduction in funding cannot support its claim of injury in fact and that any "diversion of resources to litigation . . . is considered a 'self-inflicted' budgetary choice that cannot qualify as an injury in fact."  Def.'s Reply 3 (first citing *Hodgkins v. Holder*, 677 F. Supp. 2d 202, 206 (D.D.C. 2010), then quoting *Feld*, 659 F.3d at 25 (citation omitted)).  For the following reasons, Defendant has the better argument.

To determine whether an organization has standing in its own right, a court "ask[s], first, whether the agency's action or omission to act injured the [organization's] interest and, second, whether the organization used its resources to counteract that harm."  *Food & Water Watch*, 808 F.3d at 919 (second alteration in original) (quoting *PETA v. USDA*, 797 F.3d 1087, 1093 (D.C. Cir. 2015)).  To establish an injury to its organizational interests that qualifies as injury in fact, "an organization must allege that the defendant's conduct perceptibly impaired the organization's ability to provide services."  *Turlock Irrigation Dist. v. FERC,* 786 F.3d 18, 24 (D.C. Cir. 2015).  Such perceptible impairment requires the defendant's conduct to inhibit the organization's "daily operations."  *PETA*, 797 F.3d at 1094 (quoting *Action All. of Senior Citizens of Greater Phila. v. Heckler*, 789 F.2d 931, 938 (D.C. Cir. 1986)).  "Furthermore, an organization does not suffer an injury in fact where it 'expend[s] resources to educate its

members and others' unless doing so subjects the organization to 'operational costs beyond those normally expended.'" *Food & Water Watch*, 808 F.3d at 919 (quoting *Nat'l Taxpayers Union, Inc. v. United States*, 68 F.3d 1428, 1434 (D.C. Cir. 1995)) (citing *Nat'l Ass'n of Home Builders v. EPA,* 667 F.3d 6, 12 (D.C. Cir. 2011)).

Because Freedom Watch does not sufficiently allege an injury to its interests, Plaintiff's contentions concerning injury in fact each fail at the initial stage of the Court's inquiry. Take, first, the face of the complaint itself. The pleading does not reference any injury in fact that is specific to Freedom Watch as an organization. In its complaint, Plaintiff seeks a writ of mandamus to ensure that the "immigration laws of the United States of America" operate "to ensure that those who become part of the country and particularly those who lead it bear allegiance and loyalty to the United States[,] . . . consistent with the constitutional[,]" statutory, and regulatory "design and intention." Compl. 26. Apart from the bald assertion that a writ of mandamus is necessary because "Plaintiff will have no adequate remedy at law other than [such a writ] to order the agency to take action" in response to Freedom Watch's petition to DHS, *id.* ¶ 8, Plaintiff does not identify any harm to the organization, specifically, that DHS has caused. If anything, Freedom Watch styles the asserted harm as one that affects "[t]he American people" as a whole, who "are entitled to a clear decision and the confidence that the law is being respected and upheld." *Id.* ¶ 15. But it is black letter law that such an interest in general law enforcement, common to all citizens, does not create standing. *Lujan*, 504 U.S. at 573–74 ("[A] plaintiff raising only a generally available grievance about government—claiming only harm to his and every citizen's interest in proper application of the Constitution and laws, and seeking relief that no more directly and tangibly benefits him than it does the public at large—does not state an Article III case or controversy."). In other words, an asserted interest in the government

following the law is insufficiently concrete and particularized to establish injury in fact—as

Defendant notes. *See* Def.'s Mot. 7 (citing *Valley Forge Christian Coll. v. Ams. United for*

*Separation of Church & State, Inc.*, 454 U.S. 464, 482–83 (1982); *Bernstein v. Kerry*, 962 F.

Supp. 2d 122, 128 (D.D.C. 2013)). Freedom Watch's complaint provides no other factual

allegations or argumentation at all to explain how, precisely, the *organization* is harmed. Thus,

the complaint itself fails to establish injury in fact under an organizational standing theory.

Nor do the allegations advanced in Plaintiff's opposition cure this deficiency. Consider

Plaintiff's assertions that Defendant's inaction "harms Freedom Watch's purpose and mission."

Pl.'s Opp'n 4. At no point does Plaintiff offer any concrete and particularized factual allegations

that explain how, exactly, the inaction hurt its mission or otherwise "perceptibly impaired the

organization's ability to provide services." *Turlock Irrigation Dist.,* 786 F.3d at 24. Again, the

sole answer provided in the complaint is that the organization is generally interested in enforcing

the law on behalf of all citizens, which is plainly inadequate to connect Plaintiff's assertions to a

concrete and particularized harm to the organization's mission. Freedom Watch does say a bit

more in its opposition, stating that its mission is "to educate the public of government corruption

and abuse," and that it has been unable to "fulfill its mission . . . through its normal processes of

submitting FOIA requests and litigation." Pl.'s Opp'n 7. Missing, though, is any further

discussion to link up DHS's alleged inaction to the organization's lack of access to information

and/or interference with its operations. Filling in the dots here and attempting to give Freedom

Watch the generous read that it is due at this stage of litigation, the Court imagines Plaintiff to

suggest that, had DHS acted on its petition, the organization could then have submitted FOIA

requests, obtained information, and subsequently released that information to the public. On this

theory, Plaintiff is deprived of information that it could have accessed if the agency had acted.

In other words, what Freedom Watch seems to be alleging—to the extent it goes beyond abstract and conclusory generalizations about harm to its mission at all—is an informational injury.

However, an argument for informational injury is a poor fit here. To establish such an injury, "a party shows that 'it has been deprived of information that, on its interpretation, a statute requires the government or a third party to disclose to it, and [that] it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure.'" *Judicial Watch, Inc. v. Office of Dir. of Nat'l Intelligence*, No. 1:17-CV-00508 (TNM), 2018 WL 1440186, at *2 (D.D.C. Mar. 22, 2018) (quoting *Friends of Animals v. Jewell*, 828 F.3d 989, 992 (D.C. Cir. 2016)); *see also FEC v. Akins*, 524 U.S. 11, 21–22 (1998). A closer read of the case on which Freedom Watch primarily relies—*PETA*, 797 F.3d 1087— reveals why this argument does not succeed in this context. Plaintiff suggests that *PETA* presented facts that are "nearly indistinguishable" from the case at hand. Pl.'s Opp'n 7. But *PETA* involved the USDA's failure to apply Animal Welfare Act ("AWA") general welfare standards to non-research birds, thereby specifically denying an animal rights organization access to "investigatory information, and a means by which to seek redress for bird abuse." 797 F.3d at 1095. As such, the agency's inaction pursuant to the AWA impaired the organization's "daily operations." *Id.* at 1094. In this case, in contrast, Freedom Watch is alleging that an agency's failure to act in the manner that the INA requires (on Plaintiff's view of the law) has deprived it of the opportunity to submit FOIA requests regarding the agency's action and thereby obtain the information that the DHS action would have produced. At no point does Freedom Watch explain, though, how any particular portion of the INA requires disclosure of information or how, specifically, "it suffers, by being denied access to that information, the type of harm Congress sought to prevent by requiring disclosure." *Friends of Animals*, 828 F.3d at 992.

Thus, Freedom Watch's attempt to rely on *PETA*, along with its broader effort to establish a harm based on lack of access to information, proves unavailing.

Elsewhere in its opposition brief, Plaintiff takes a different tack and suggests that the financial ramifications of DHS's conduct give rise to injury in fact. Pl.'s Opp'n 4, 7. This argument has two parts. Freedom Watch initially contends that "Defendant's inaction . . . necessarily cause[d] a corresponding downturn in financial support" and deprived the organization of "positive publicity" that would have allowed Freedom Watch to reap "a substantial increase in financial support" from contributions and donations. *Id.* at 4. Plaintiff also asserts that it needed to expend additional resources "to counteract Defendant's specific refusal to act."[4] *Id.* at 7.

Both of these claims similarly miss the mark. Taking them in reverse order, Plaintiff asserts that Freedom Watch "had to expend resources outside of the scope of its normal course of business" by filing this lawsuit. *Id.* at 7. But this Circuit has clearly established that "an organization's use of resources for litigation, investigation in anticipation of litigation, or advocacy is not sufficient to give rise to an Article III injury." *Food & Water Watch*, 808 F.3d at 919 (citing *PETA*, 797 F.3d at 1093–94; *Turlock Irrigation Dist.*, 786 F.3d at 24); *see also Equal Rights Ctr. v. Post Props., Inc.*, 633 F.3d 1136, 1140 (D.C. Cir.) ("[D]iversion of resources to litigation or investigation in anticipation of litigation does not constitute an injury in fact sufficient to support standing."). This bare assertion is thus inadequate as a matter of law, and

---

[4] Plaintiff mentions resource expenditures required for "the filing of the OPR and IG Complaint in ECF No. 1-1." Pl.'s Opp'n 7. However, the only material included in ECF No. 1-1 is Freedom Watch's petition to DHS. The Court is thus uncertain what further documents, if any, Plaintiff references. In any event, because, as the Court discusses here, Plaintiff has not sufficiently alleged an injury to its organizational interests, this uncertainty does not affect the Court's analysis. The Court discusses Plaintiff's argument concerning expenditure of resources in more detail below.

Plaintiff cannot rely on its own voluntarily-expended litigation-related costs to bootstrap its way into standing.

Plaintiff's contentions concerning the loss of contributions are a closer call, yet ultimately also fall short of adequately alleging facts to establish injury in fact. Freedom Watch's argument rests on the factual allegation that Defendant's inaction "necessarily cause [sic]" a "downturn in financial support" and also deprived it of positive publicity that would have created an increase in donations.[5] Pl.'s Opp'n 4. Plaintiff is correct that "[a]n organization is obviously 'harmed if its contributors cease giving it money,'" and "even a slight injury is sufficient to confer standing." *N.Y. Republican State Comm. v. SEC*, 927 F.3d 499, 504 (D.C. Cir. 2019), *cert. denied sub nom. N.Y. Republican State Comm. v. SEC*, No. 19-343, 2020 WL 129564 (U.S. Jan. 13, 2020) (quoting *Taxation with Representation of Wash. v. Regan*, 676 F.2d 715, 723 (D.C. Cir. 1982)). The problem, though, is that Plaintiff's filings include no factual allegations that speak to a past financial injury with any particularity or concreteness. Even at the motion to dismiss stage, "an allegation of injury or of redressability that is too speculative will not suffice to invoke the federal judicial power." *Osborn*, 797 F.3d at 1064 (quoting *United Transp. Union v. ICC*, 891 F.2d 908, 911 (D.C. Cir. 1989). The deciding court must distinguish "allegations of *facts, either historical or otherwise demonstrable,* from allegations that are really predictions." *Id.* (emphasis in original) (quoting *United Transp. Union*, 891 F.2d at 912). In this case, because Freedom Watch does not link the alleged past financial harm to any historical or otherwise demonstrable facts, and because the complaint contains no other "factual details" to

---

[5] Plaintiff's opposition brief uses the phrase "necessarily cause," leaving the Court uncertain as to whether Freedom Watch is alleging a past harm (e.g., "caused") or an ongoing and/or future harm (e.g., "causes"). The Court thus considers both possibilities.

"support the alleged causal link between" the agency's inaction "and the economic harm," *id.* at 1065, Freedom Watch's bare allegation is too speculative to establish injury in fact.

In addition, Plaintiff does not adequately establish that Defendant's inaction produced or will produce a future harm to the organization.  In assessing the possibility of a future injury as a result of Defendant's inaction, the operative question is whether Freedom Watch has alleged facts to plausibly establish that the purported harm (loss of contributions and donations) is either "certainly impending" or that there is a "substantial risk" that it "will occur."  *Id.* (first referencing *Clapper*, 568 U.S. at 410–14, then citing *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014)).  "[T]he proper way to analyze" such an "increased risk-of-harm claim is to consider the ultimate alleged harm . . . as the concrete and particularized injury and then to determine whether the increased risk of such harm makes injury to . . . [the organization] sufficiently 'imminent' for standing purposes."  *Attias v. Carefirst, Inc.*, 865 F.3d 620, 627 (D.C. Cir. 2017) (quoting *Food & Water Watch*, 808 F.3d at 915).

Applying these principles here, Freedom Watch has not cleared the injury in fact bar. Plaintiff provides only the bare statement that the agency's inaction "necessarily causes[s]" the asserted harm and that, in a counterfactual world where the agency did act, the organization "would have clearly experienced a substantial increase in financial support."  Pl.'s Opp'n 4.  This assertion appears to set forth a causal chain wherein, because Freedom Watch is "entirely reliant on support by its members or supporters in the form of contributions and donations," any event that decreases its donations harms the organization's finances.  *Id.*  Yet Plaintiff never offers further factual allegations to establish, with any level of clarity, a basis for the claim that there is a "substantial risk" that there will be a "downturn in financial support" as a result of DHS's

inaction.[6]  Without more, though, the Court can only speculate about this asserted future harm.

A comparison of *Attias*, 865 F.3d 620 (finding injury in fact) and *Clapper*, 568 U.S. 398 (finding no injury in fact) is instructive.  In *Attias*, this Circuit found the alleged risk of a future harm for victims of a data breach to be "substantial."  *Id.* at 628.  The *Attias* court drew this conclusion because the plaintiff's complaint made clear that "an unauthorized party ha[d] already accessed personally identifying data on [Defendant's] servers, and[,] . . . at the very least, it [was] plausible[,] . . . to infer that this party ha[d] both the intent and the ability to use that data for ill." *Id.*  The suit was thus distinct from *Clapper*, wherein the feared harm—the government's interception of the plaintiffs' overseas communications—depended on the actions of a number of third parties, "none of which was alleged to have occurred by the time of the lawsuit," and which "would not have arisen unless a series of independent actors . . . exercised their independent judgment in a specific way."  *Id.* (discussing *Clapper*, 568 U.S. at 410–14).

In this case, Freedom Watch's omission of any supporting facts places the organization closer to the position of the plaintiffs in *Clapper* than to those in *Attias*.  There is no discussion of financial injury to the organization in the complaint whatsoever.  And as noted previously, the opposition brief never says anything more about the organization's finances and how they are affected by government responses to organizational actions taken in furtherance of its mission. For instance, has Freedom Watch undertaken similar petitions in the past, and has the result been an upturn in donations?  Are there historic downturns in donations after an agency fails to act in response to Freedom Watch's mission?  How does Freedom Watch know that any such downturns are connected to the harm at all?  Or, conversely, have there been periods when

---

[6] Because this "substantial risk" threshold is lower than *Clapper*'s "certainly impending" language, *see Attias*, 865 F.3d at 627–28 (discussing standards), Plaintiff's failure to meet the lower standard necessarily means that it also cannot satisfy the higher standard.

members were motivated to support the organization more so that it could continue to push an obstinate agency towards revealing information?  And again, how would the organization measure such an effect?  Without knowing anything about these facts, the Court can only guess at the "attenuated chain of possibilities," *Clapper*, 568 U.S. at 410, involving third-party actions by independent actors exercising independent judgment, that produces the asserted harm. Although Freedom Watch need not plead its case with certainty at the motion to dismiss stage, the organization nonetheless must plausibly allege a "substantial risk" of future injury.  *Attias*, 865 F.3d at 826 (citing *In re Idaho Conservation League*, 811 F.3d 502, 509 (D.C. Cir. 2016); *Nat'l Ass'n of Broadcasters v. FCC*, 789 F.3d 165, 181 (D.C. Cir. 2015); *Sierra Club v. Jewell*, 764 F.3d 1, 7 (D.C. Cir. 2014)).  The problem for Freedom Watch is that it has failed to make its case by "advancing 'specific facts' to support its claim to have suffered an injury-in-fact."  *N.Y. Republican State Comm.*, 927 F.3d at 503–04 (quoting *Lujan*, 504 U.S. at 561-62) (citing *Sierra Club v. EPA*, 292 F.3d 895, 899 (D.C. Cir. 2002).  Thus, Plaintiff's bare assertions cannot establish injury in fact based on an alleged harm to the organization's finances.  *See Iqbal*, 556 U.S. at 678 (emphasizing that, even under the more permissive 12(b)(6) standard, "[t]hreadbare recitals" and "mere conclusory statements" are insufficient); *Food & Water Watch*, 808 F.3d at 913 (emphasizing that a court addressing a Rule 12(b)(1) motion need not "accept inferences that are unsupported by the facts set out in the complaint") (quoting *Arpaio,* 797 F.3d at 19)). Accordingly, Plaintiff has not established that it has "suffered a concrete and demonstrable injury to [its] activities" sufficient to endow it with organizational standing.[7]  *Food & Water Watch*, 808 F.3d at 919.

---

[7] Because it reaches this conclusion at the first prong of the organizational standing analysis, the Court need not consider the second prong: whether Freedom Watch used its resources to counteract the alleged harm.  *Accord Food & Water Watch*, 808 F.3d at 919 ("We

## 2. Associational Standing

Plaintiff also raises an associational standing theory based on its "represent[ation of] the views, ideologies[,] and interests of its members and supporters." Pl.'s Opp'n 5. Citing *NAACP v. Ala. ex rel. Patterson*, 357 U.S. 449, 458–60 (1958), Freedom Watch maintains that it has standing to act on its members' behalf, which is necessary to "protect[] the identities" of members who "would otherwise be ridiculed, if not retaliated against," if they were to bring suit in their own name and thereby "express[] unpopular political opinions." Pl.'s Opp'n 5. Defendant rejects these claims, arguing that Freedom Watch has not established that it is a membership organization that can qualify for associational standing.[8] Def.'s Reply 6–8. For the forthcoming reasons, the Court agrees with Defendant and concludes that Freedom Watch has not established associational standing.

An organization has associational "standing to sue under Article III of the Constitution of the United States only if (1) at least one of its members would have standing to sue in his own

---

need not address the second prong of th[e organizational standing] inquiry because it is clear that FWW has not sufficiently alleged an injury to its interest."). But the Court notes that the allegations here seem similarly lacking.

[8] Defendant's reply brief also argues that "Plaintiff has not pled facts sufficient to establish that it is the functional equivalent of a membership organization." Def.'s Reply 7; *see generally id.* at 7–10. On the Court's read of Plaintiff's submissions, it is clear that Freedom Watch's associational standing argument derives from a claim brought on behalf of its members. *See, e.g.*, Pl.'s Opp'n 4–5 (asserting that an organization which itself suffers no injury may have "standing solely as the representative of its members"); *id.* at 5 (invoking *NAACP*, 357 U.S. 458–60, for the proposition that "an association can act on behalf of its members to represent their interests," then analogizing to *NAACP* to contend that Freedom Watch represents its members and supporters' "views, ideologies[,] and interests"). Thus, particularly because Plaintiff did not raise, and has not had the opportunity to brief, the question of whether it could establish standing as the functional equivalent of a membership organization, the Court expresses no opinion on Freedom Watch's standing under such a theory. *See Bronner v. Duggan*, 249 F. Supp. 3d 27, 41 (D.D.C. 2017) (declining to consider argument raised for first time in reply); *United States ex rel. Morsell v. Symantec Corp.*, 130 F. Supp. 3d 106, 122 n.14 (D.D.C. 2015) ("Because new arguments asserted in reply are waived, the Court declines to consider . . . [the party's] argument.").

right; (2) the interest it seeks to protect is germane to its purpose; and (3) neither the claim asserted nor the relief requested requires the member to participate in the lawsuit." *Am. Trucking Ass'ns v. Fed. Motor Carrier Safety Admin.*, 724 F.3d 243, 247 (D.C. Cir. 2013) (quoting *Rainbow/PUSH Coal. v. FCC*, 330 F.3d 539, 542 (D.C. Cir. 2003)) (citing *Hunt v. Wash. State Apple Adver. Comm'n* (*Hunt*)*, 432 U.S. 333, 343 (1977)). Both parties appear to recognize this rule, *see* Pl.'s Opp'n 5 (quoting similar rule statement in *Hunt*, 432 U.S. at 343); Def.'s Reply 6 (offering similar recitation of rule and citing *Fund Democracy, LLC v. SEC*, 278 F.3d 21, 25 (D.C. Cir. 2002)), and dispute whether Freedom Watch satisfies this standard.

Here, Plaintiff has not alleged facts sufficient to satisfy the associational standing standard. Notably, Freedom Watch does not identify a single member or provide any declarations or statements to indicate the organization brings suit on behalf of their interests. And because, as Defendant notes, "Plaintiff has not provided statements from any members or supporters describing their views," Def.'s Reply 7, the Court can do no more than speculate about whether any of its members would have standing to sue in their own right. For instance, without knowing more about the members on behalf of whom Freedom Watch says it brings suit, the Court cannot assess whether the organization can "satisfy the first requirement of the associational standing inquiry" by showing that "at least one of its members has suffered an 'injury-in-fact' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"[9] *Sierra Club v. Fed. Energy Regulatory Comm'n*, 827 F.3d 59, 65 (D.C. Cir. 2016) (quoting *Friends of the Earth, Inc.*, 528 U.S. at 180–81). By saying nothing about its

---

[9] To satisfy the first requirement of the associational standing inquiry, Plaintiff would also be required to establish the other two elements of standing (traceability and redressability) for at least one of its members. *Sierra Club*, 826 F.3d at 65. Because, as previously mentioned, the parties focus on injury in fact and redressability, and because Plaintiff's argument falls short at the injury in fact stage, the Court need not discuss the other two elements here.

members' identities, the nature of their interests, or how they have suffered an "actual," "concrete and particularized" harm, Freedom Watch has failed to establish how DHS's alleged inaction has caused one or more members to suffer an injury in fact.  Thus, the Court cannot say that Plaintiff has plausibly established standing for one or more members, as is required to support Freedom Watch's associational standing theory.

Rather than offering more information about its members that might establish how, if at all, at least one member has standing in her own right, Freedom Watch seems to contend that it has standing because it is protecting its members' identities.  Pl.'s Opp'n 5 (analogizing its claim to *NAACP*, 357 U.S. 449, and urging that organization is representing its members to permit them to avoid "ridicule[]" and possible "retaliatia[on]"); *see also* Def.'s Reply 8 n.2 ("Plaintiff appears to argue that an organization is automatically conferred associational standing for Article III purposes because its members . . . do not wish to be identified out of fear of ridicule or retaliation.").  But this claim overreads *NAACP*, 357 U.S. 449.  There, the Supreme Court held that the NAACP had standing to "assert, on behalf of its members, a right personal to them to be protected from compelled disclosure by the State of their affiliation with the [NAACP] as revealed by the membership lists."  *Id.* at 459–60.  The *NAACP* court, in other words, established that the organization could represent its members' individually-held, constitutional right to freedom of association (and, thus, to freedom from state-compelled disclosure of association) where requiring that the asserted right "be claimed by the members themselves would result in nullification of the right at the very moment of its assertion."  *Id.* at 459.  *NAACP* thus does not stand for the broad proposition that an organization automatically obtains Article III standing on behalf of its members anytime that a member would prefer to avoid identification—as Plaintiff appears to assert.  *See* Pl.'s Opp'n 5.  And on the Court's read of *NAACP*'s facts and holding,

Freedom Watch's reliance on *NAACP* is unpersuasive because Plaintiff does not articulate how this suit involves an underlying, individually-held, constitutional right that is threatened by a state's demand that the organization reveal its membership list. Without offering facts to support such a claim, Plaintiff's reliance on *NAACP* as its basis for associational standing is misplaced.

Thus, the bottom line is that Freedom Watch has failed to establish injury in fact to support associational standing. Accordingly, Plaintiff has not asserted any basis for standing, and the Court grants Defendant's motion to dismiss for lack of subject matter jurisdiction.[10]

### B. Failure to State a Claim for Relief

Even if Plaintiff had standing, though, its claim would still fail to survive Defendant's motion to dismiss. There are two fundamental defects, both of which flow from the same underlying point: because, for the reasons set forth below, there is no statutory provision that mandates agency action here, DHS's enforcement decision was committed to agency discretion by law. And because this is the case, Plaintiff cannot (1) establish that it is entitled to mandamus relief or (2) state a claim for relief under the APA. To underscore why Plaintiff has not plausibly stated a valid claim for relief, the Court will begin with Plaintiff's arguments seeking mandamus and then turn to Freedom Watch's alternative argument under the APA.

#### 1. Plea for Mandamus Relief

As the Court previously noted, the first remedy that Plaintiff seeks is a writ of mandamus ordering DHS to respond to Plaintiff's petition by investigating Representative Omar. *See*

---

[10] Because, for the reasons discussed *supra* Part III.A, Plaintiff does not establish injury in fact under an organizational standing theory, and because, for the reasons just discussed, Plaintiff also fails to establish injury in fact under an associational standing theory, Freedom Watch cannot satisfactorily establish the very first requirement of the "irreducible constitutional minimum of standing." *Lujan*, 504 U.S. at 560. Accordingly, the Court need not consider whether Plaintiff has met the other aspects of Article III standing or assess Defendant's prudential standing arguments concerning the "zone of interests" test.

Compl. 25–26; Pl.'s Opp'n 7 ("Freedom Watch's complaint clearly asks for 'an order for the issuance of a writ of mandamus for the Defendant to enforce governing immigration law[.]'" (quoting Compl. 1)). Freedom Watch contends that the Court has the authority to issue this writ because, on Plaintiff's account, 8 C.F.R. § 270.2(b) "clearly sets forth a mandatory duty" for DHS to act "once certain prerequisites are met, as they have been here." *Id.* at 8. Stressing the use of the word "shall" in the cited regulation, Freedom Watch argues that DHS "*must* investigate*" once it "receives a complaint that has a substantial probability of validity."[11] *Id.* Plaintiff emphasizes, moreover, that although these statutes establish DHS's "clear duty to act," *id.* at 12, they are not the basis of its claim for relief (mandamus), which instead derives from the All Writs Act, 28 U.S.C. § 1651. *Id.* at 11–12. Defendant retorts that none of the cited statutory or regulatory provisions establish that DHS was required to act on Plaintiff's petition, such that a writ of mandamus may not issue. Def.'s Mot. 11–12. For the following reasons, Defendant has the better argument.[12]

---

[11] The text of the regulation refers to a "substantial probability of validity." 8 C.F.R. § 270.2(b). Plaintiff's filing transposes the words in this regulation and discusses the "substantial validity of probability," an error that Defendant at times reproduces. *See, e.g.*, Def.'s Mot. 12. Here and throughout this memorandum opinion, the Court quotes the regulation as it is written.

[12] At times, Defendant discusses a writ of mandamus in the context of its redressability argument, contending that Plaintiff cannot establish the redressability prong of standing because it cannot predict the result of any (hypothetical) enforcement action against Ms. Omar. *See* Def.'s Mot. 11–12. Plaintiff states, however, that this stance misconstrues its argument: according to Freedom Watch, it is "besides the point" whether any investigation would result in actions taken against Ms. Omar because "[t]he investigation, in and of itself, would redress Freedom Watch's injury." Pl.'s Opp'n 8. The Court need not resolve this dispute because, as discussed previously, Freedom Watch lacks standing on independent grounds and, as discussed next, there are more fundamental reasons why the remedy of mandamus is inappropriate here, and which this Court assesses pursuant to Federal Rule of Civil Procedure 12(b)(6) and not Rule 12(b)(1). *See Sierra Club v. Jackson*, 648 F.3d 848, 854 (D.C. Cir. 2011) ("[A] complaint seeking review of agency action 'committed to agency discretion by law' has failed to state a claim under the APA, and therefore should be dismissed under Rule 12(b)(6), not under the jurisdictional provision of Rule 12(b)(1)." (first quoting 5 U.S.C. § 701(a)(2), then citing *Oryszak v. Sullivan*, 576 F.3d 522, 525 (D.C. Cir. 2009))).

The Mandamus Act, 28 U.S.C. § 1391, makes clear that a court has jurisdiction to issue a writ of mandamus only if "(1) the plaintiff has a clear right to relief; (2) the defendant has a clear duty to act; and (3) there is no other adequate remedy available to plaintiff."[13] *Fornaro v. James*, 416 F.3d 63, 69 (D.C. Cir. 2005) (quoting *Power v. Barnhart*, 292 F.3d 781, 784 (D.C. Cir. 2002); *see also Am. Hosp. Ass'n v. Burwell*, 812 F.3d 183, 189 (D.C. Cir. 2016) (citing *United States v. Monzel*, 641 F.3d 528, 534 (D.C. Cir. 2011) (offering slightly different formulation of same three prerequisites); *Clarke v. Holder*, 767 F. Supp. 2d 106, 111–12 (D.D.C. 2011) (stating rule and citing cases). "[I]f there is no clear and compelling duty under the statute as interpreted, the district court must dismiss the action." *In re Cheney*, 406 F.3d 723, 729 (D.C. Cir. 2005) (en banc); *accord Am. Hosp. Ass'n*, 812 F.3d at 189 (citing *In re Medicare Reimbursement Litig.*, 414 F.3d 7, 10 (D.C. Cir. 2005)). "The party seeking mandamus has the burden of showing that its right to issuance of the writ is clear and indisputable." *Am. Hosp. Ass'n*, 812 F.3d at 189 (quoting *Power,* 292 F.3d at 784). Even if all three requirements are met, "however, a court may grant relief only when it finds 'compelling . . . equitable grounds.'" *In re Medicare Reimbursement Litig.*, 414 F.3d at 10 (quoting *Am. Cetacean Soc'y v. Baldrige*, 768 F.2d 426, 432 (D.C. Cir. 1985), *rev'd on other grounds sub nom. Japan Whaling Ass'n v. Am. Cetacean Soc'y*, 478 U.S. 221 (1986)).

Here, Plaintiff has not plausibly established its "clear and indisputable" right to issuance of the writ. *Am. Hosp. Ass'n*, 812 F.3d at 189 (quoting *Power,* 292 F.3d at 784). The regulation

---

[13] Plaintiff cites an unpublished, out-of-circuit case to argue that "[t]he authority of federal courts to issue writs of mandamus is derived from the All Writs Act, 28 U.S.C. § 1651." Pl.'s Opp'n 11 (quoting *United States v. Bell*, No. 1:00-CR-153, 2008 WL 4449910, at *3 (E.D. Tenn. Sept. 29, 2008)). This assertion concerning the source of the Court's authority to grant a remedy is distinct from the question of whether Plaintiff has met the threshold requirements to make out this claim to relief. The Court focuses only on Freedom Watch's failure to plausibly state a claim upon which relief can be granted and dismisses Plaintiff's claims on these grounds, without expressing any opinion concerning Plaintiff's invocation of the All Writs Act.

on which Freedom Watch rests its argument, 8 C.F.R. § 270.2(b), is a portion of DHS's

immigration regulations that addresses enforcement procedures in the context of document

fraud.[14] The specific cited subsection describes the investigation process upon receipt of a

procedurally valid third-party complaint, stating that DHS "shall investigate only those

complaints which, on their face, have a substantial probability of validity."[15] *Id.* Freedom

Watch's contention hangs on the use of the word "shall," which it maintains mandates agency

action so long as the factual predicate ("substantial probability of validity") is met. The problem

with this contention, however, is that Plaintiff fails to square its position with the clear holding of

*Heckler v. Chaney*, 470 U.S. 821 (1985), and its progeny.

In *Chaney*, the Supreme Court "instructed that when 'shall' is used in an enforcement

provision, it should be construed to confer discretion on an agency unless the statute or

regulations provide substantive standards that constrain the exercise of discretion." *Clarke*, 767

F. Supp. 2d at 112 (citing *Chaney*, 470 U.S. at 835; *Dubois v. Thomas*, 820 F.2d 943, 948–49

(8th Cir. 1987); *City of Yakima v. Surface Transp. Bd.*, 46 F. Supp. 2d 1092, 1099–1100 (E.D.

Wash. 1999)). In addition to *Chaney*'s specific directive, moreover, this Circuit has emphasized

that even though "shall" "is usually interpreted as 'the language of command,'" it is improper to

"consider those words in isolation," without "also consider[ing] the language and structure of the

_____

[14] Though Freedom Watch's complaint also mentions several other statutory provisions, Plaintiff's filings identify only this regulation as the source of the asserted "mandatory duty" that gives rise to Defendant's "clear duty to act" by investigating Representative Omar. Pl.'s Opp'n 9; *see also id.* at 8 ("Freedom Watch identified 8 C.F.R. § 270.2(b), which clearly sets forth a mandatory duty[.]"); *id.* at 12 ("8 C.F.R. § 270.2(b) sets forth a mandatory investigation[.]"). Plaintiff's opposition does not develop any argument concerning any other statutory or regulatory basis for DHS's alleged duty to investigate, which is the asserted source of Plaintiff's harm and the basis for the remedy that it seeks.

[15] DHS has delegated authority under the Immigration and Nationality Act to its components U.S. Customs and Border Protection ("CPB"), ICE, and USCIS, which are "to administer and enforce certain provisions of the Immigration and Nationality Act and all other laws relating to immigration." 8 C.F.R. § 100.1.

[provision]." *Sierra Club*, 648 F.3d at 856 (citing *Zivotofsky v. Sec'y of State*, 571 F.3d 1227, 1243 (D.C. Cir. 2009) (internal quotations omitted)).

These principles control the case. Significantly, the cited provision is self-evidently an enforcement provision based on § 270.2's very title: "Enforcement procedures." 8 C.F.R. §270.2. More specifically, it is a civil enforcement action, which means that it is properly considered as a prosecutorial function of DHS. *See Citizens for Responsibility and Ethics in Wash. v. FEC* (*CREW*), 892 F.3d 434, 438 (D.C. Cir. 2018) ("Under the APA, agency attorneys who bring civil enforcement actions are engaged in 'prosecuting functions.'" (quoting 5 U.S.C. § 554(d))).[16] "As such, *Chaney* compels this Court to begin with the presumption that it "confer[s] discretion" on DHS. 470 U.S. at 835. *Accord Town of Castle Rock v. Gonzales*, 545 U.S. 748, 760–61 (2005) (finding that use of word "shall" in ordinance did not impose a mandatory duty and emphasizing "deep-rooted nature of law-enforcement discretion"). A close read of the provision's plain text affirms the validity of this background assumption. Although the sentence on which Plaintiff relies does contain the word "shall," it further specifies that INS is to investigate "*only* those complaints" that satisfy a baseline condition ("substantial probability of validity") "on their face." 8 C.F.R. § 270.2(b) (emphasis added). As Defendant suggests, Def.'s Mot. 12 (asserting that "[s]uch language is limiting"), the inclusion of the word "only" necessarily implies that there is some subset of complaints that INS has discretion *not* to investigate. Such a formulation is a far cry from a binding mandate to investigate in all cases.

But even if this were not the case, and even if the Court found that the relevant conditions were met here (which it need not decide), Freedom Watch's position would remain untenable. The central gap in Plaintiff's argument is the failure to offer any plausible basis, or indeed any

---

[16] The Court refers to the APA here to establish how to characterize the cited immigration regulation and discusses Plaintiff's APA claim *infra* Section III.B.2.

basis at all, to rebut *Chaney*'s controlling presumption that this enforcement procedure confers discretion on DHS. As the *Chaney* Court established, and as the Court noted above, the general rule is that an agency's failure to undertake an enforcement action is within the agency's discretion. This presumption may be overcome if the operative provision "provide[s] substantive standards that constrain the [agency's] exercise of discretion." 470 U.S. at 835. Plaintiff points to no such substantive standards, nor does it make any argument that the statutes or regulations that Freedom Watch cites briefly in its complaint cabin the agency's exercise of enforcement discretion. Instead, Freedom Watch appears to insist that considering whether or not enforcement decisions about denaturalization or removal are "'inherently a matter committed to agency discretion' is putting the [horse] before the cart." Pl.'s Opp'n 10. On the Court's best read of this less than crystal clear argument, Freedom Watch seems to be suggesting that any determination about whether to initially investigate is severable from "any decision on whether to commence denaturalization and removal proceedings." *Id.* However, Freedom Watch does not provide any legal basis for this separation of investigation from denaturalization and removal, as opposed to considering them as interrelated stages in the broader category of enforcement decisions. Nor do Plaintiff's claims engage with the baseline principle that "[f]ederal officials, as an initial matter, must decide whether it makes sense to pursue removal at all," *Ariz. v. United States*, 567 U.S. 387, 396 (2012) (citing § 1229a(c)(4)), or reconcile the tension between Plaintiff's theory about investigation and such well-established enforcement discretion. Put simply, it strains credulity for the Court to imagine that a regulation promulgated by DHS could *require* investigation (as Plaintiff urges), yet the statutory structure as a whole could bestow the agency with such broad discretion about whether to pursue removal or otherwise enforce the law. Thus, Freedom Watch has failed to plausibly allege that DHS has a

clear duty to act, and the Court must dismiss Plaintiff's mandamus claim. *In re Cheney*, 406 F.3d at 729.

### 2. APA Claim for Relief

In the alternative to its claim for mandamus relief, Freedom Watch argues that it has properly stated a claim for relief under the APA's private cause of action for "[a] person adversely affected by an agency action," including the agency's failure to act. Pl.'s Opp'n 12 (first citing 5 U.S.C. § 702, then citing 5 U.S.C. § 551(13)). Plaintiff's APA claim, like the mandamus claim that the Court just addressed, rests on 8 C.F.R. § 270.2(b) for the proposition that DHS has a mandatory duty to investigate "once the threshold [requirement of] 'substantial probability of validity' is met.'" *Id.* According to Plaintiff, then, DHS's failure to investigate in the manner it is legally obligated to do, given Plaintiff's factual allegations, entitles Freedom Watch to bring suit under the APA. For the following reasons, however, this argument does not square with controlling law, and, accordingly, Plaintiff does not plausibly make out a claim upon which relief could be granted.

As discussed above, because the cited provision is plainly an enforcement provision, Plaintiff's APA claim involves DHS's choice not to undertake an enforcement action (by choosing not to investigate Representative Omar in response to Freedom Watch's petition). "[I]n cases that involve agency decisions not to take enforcement action," a court "begin[s] with the presumption that the agency's action is unreviewable." *Sierra Club*, 648 F.3d at 855 (citing *Ass'n of Irritated Residents v. EPA*, 494 F.3d 1027, 1031 (D.C. Cir. 2007); *Chaney*, 470 U.S. at 832–33). The mere "use of the mandatory 'shall' is not sufficient to provide legal standards for judicial review of the [agency's] decision not to act." *Id.* at 856. Unless there is "'law' to apply in judging how and when an agency should exercise its discretion," APA § 701(a)(2) "bars

judicial review" of an agency's (in)action. *CREW*, 892 F.3d at 440 (citing *Chaney*, 470 U.S. at 830) (citations omitted).

Here, Plaintiff's APA argument, which it develops in a conclusory, four-sentence paragraph, *see* Pl.'s Opp'n 12, provides no grounds on which to rebut *Chaney*'s presumption or to otherwise suggest that there is "law to apply" in this case. Plaintiff never goes beyond repeating its contention that the cited regulation sets forth a mandate for DHS to act. Freedom Watch's argument thus turns on the "use of the mandatory shall." *Sierra Club*, 648 F.3d at 856. But as this Court discussed previously with respect to mandamus, Freedom Watch has never explained how the provision on which it relies provides guidance as to what causes a petitioner's complaint to DHS to, "on its face, have a substantial probability of validity." Pl.'s Opp'n 9 (quoting 8 C.F.R. § 270.2(b)). Because there is nothing in the substantive provision to which Plaintiff points that "has provided guidelines for the agency to follow in exercising its enforcement powers," *CREW*, 892 F.3d at 439 (quoting *Chaney*, 470 U.S. at 832–33) (citing *Webster v. Doe*, 486 U.S. 592, 600 (1988)), there is no indication that the language on which Freedom Watch relies in fact constrains DHS's discretion concerning investigative actions. *Accord Sierra Club*, 648 F.3d at 305 (holding that, in the context of a statute that did not stipulate what made action "necessary," "the use of the mandatory 'shall' was not sufficient to provide legal standards for the court's review of the [agency's] decision not to act"). As a result, the Court is left to conclude that § 270.2(b) "is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of discretion.'" *CREW*

(quoting *Chaney*, 470 U.S. at 830).  Thus, Plaintiff has not stated a valid claim for relief pursuant to the APA.[17]

Accordingly, Freedom Watch has not carried its burden to plausibly establish a legal claim upon which relief can be granted.  Consequently, the complaint must also be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(6).

---

[17] As discussed previously with respect to mandamus, the Court does not address in depth the other statutory and regulatory provisions that Plaintiff cites because Freedom Watch never develops any argument that these provisions are the basis of DHS's alleged mandate to investigate, instead relying exclusively on 8 C.F.R. § 270.2 for this claim.  But especially because Defendant discusses each of these provisions, *see* Def.'s Mot. 21–24, it is nonetheless worth noting why Plaintiff's mere invocation of each of these provisions does not alter the Court's conclusions.  Taking them briefly in turn, Plaintiff first invokes "INA 212(a)(6)(C)(i)" as a provision that "can lead to a finding of fraud or willful misrepresentation."  Compl. ¶ 117.  This language is not only clearly permissive ("can lead"), but also does not connect up to the cited regulation and thereby provide a source of law that clearly constrains DHS's enforcement discretion.  Plaintiff then invokes a portion of the U.S. Department of Justice Criminal Resource Manual that addresses "marriage fraud," which states some of the conditions under which marriage fraud has been prosecuted.  Yet it does not provide any source of controlling law regarding investigation decisions (and is neither a statute nor a regulation, nor does it clearly control any action by DHS).  *Id.* ¶ 121.  Next, Plaintiff invokes 8 U.S.C. § 1451(c) to support its claim that "the available information" connecting Representative Omar to "overt and public support for terrorism" provides prima facie evidence that she is subject to revocation of naturalization and citizenship.  *Id.* ¶¶ 124–127.  But this discussion involves the asserted timeliness of any revocation action, *see id.* ¶ 126, and not whether the choice is within the agency's discretion, let alone how it connects to an investigation.  Plaintiff's next reference to 8 U.S.C. § 1451(a) is similarly unavailing because Freedom Watch quotes text that refers to the duty of "United States attorneys" to institute judicial proceedings upon receipt of an "affidavit showing good cause," *see id.* ¶ 129, yet does not make any argument to illuminate how this provision might provide "law to apply" that bears on DHS's determination of what gives a complaint a "substantial probability of validity" under 8 C.F.R. § 270.2 in the first instance.  *Cf. Clarke*, 767 F. Supp. 2d at 112–13 ("§ 1451(a) does not create a mandatory duty to institute proceedings[.]").  The fifth set of statutory provisions cited are 8 U.S.C. § 1324C and 8 U.S.C. § 1227(a)(3)(C), which address the penalties for document fraud (including possible removal).  Compl. ¶¶ 133–34.  These statutes speak to possible consequences that DHS may impose in appropriate cases, but again say nothing about the initial enforcement procedures themselves.  Only 8 C.F.R. § 270.2, in short, speaks to this point—and as the Court just discussed, it leaves the matter within the agency's discretion.

## IV.  CONCLUSION

For the foregoing reasons, Defendant's motion to dismiss is **GRANTED**.  An order consistent with this Memorandum Opinion is separately and contemporaneously issued.


Dated:  February 26, 2020                                    RUDOLPH CONTRERAS
                                                             United States District Judge